# HOUSTON et al. v. UTAH LAKE LAND, WATER & POWER CO. et al. (STARR et al., Interveners).

### No. 3382.   Decided December 20, 1919.   (187 Pac. 174.)

1. CORPORATIONS—AUTHORITY OF PRESIDENT DIED WITH CORPORATION. Where the right of a corporation to do business was annulled and its charter forfeited because it failed to pay the state corporation license tax, any authority that the president of the corporation had by virtue of resolutions of the board of directors died with the corporation.   (Page 400.)

2. CORPORATIONS—"ULTRA VIRES" ACT AN ACT BEYOND POWERS. An "ultra vires" act is an act beyond the powers of the corporation.   (Page 400.)

3. CORPORATIONS—ACTS OF DEFUNCT CORPORATION ABSOLUTELY VOID AND NOT SUBJECT TO RATIFICATION. Any acts of its officers in the nature of new business, not looking to a winding up of the affairs of the corporation, were wholly void and could not be ratified by the corporation, notwithstanding Comp. Laws 1917, section 870.   (Page 400.)

4. CORPORATIONS—CORPORATION FORFEITING CHARTER NOT DE JURE OR DE FACTO. It was then civilly dead, and was neither a de jure nor a de facto corporation, and had no power except to wind up its affairs under Comp. Laws 1917, section 870.   (Page 400.)

5. CORPORATIONS—COULD NOT PURCHASE CORPORATE STOCK OF ANOTHER CORPORATION AFTER FORFEITURE OF CHARTER. Acts of officers of the corporation in subsequently purchasing corporate stock of another corporation were absolutely void, such acts not looking to the assembling of its assets or the winding up of the business under Comp. Laws 1917, section 870, especially where such corporation, while existent, had no authority or power to purchase corporate stock.[1]   (Page 401.)

6. CORPORATIONS—WORLD MUST TAKE NOTICE OF GOVERNOR'S PROCLAMATION OF FORFEITURE OF CHARTER. A proclamation of the Governor of the state to forfeit the charter of a corporation because it failed to pay the state license tax was notice to all the world that thereafter, unless reinstated within the time by law provided, the corporation had no right and no power to engage in any business whatever, except such as would be necessary for the purpose of winding up its affairs.   (Page 401.)

[1] *Henriod* v. *East Tintic Development Co.*, 52 Utah, 245, 173 Pac. 134.

Appeal from District Court, Fourth District, Utah County; *A. B. Morgan*, Judge.

Action by Otho S. Houston and another against the Utah Lake Land, Water & Power Company and others, in which A. F. Starr and others intervene. Otho S. Houston dying after action was brought, his widow, Elizabeth Houston, as executrix of his last will and testament, intervened.

Judgment for defendants, and plaintiffs and the interveners appeal.

AFFIRMED.

*James Ingebretsen*, of Salt Lake City, *M. J. Moore*, of Los Angeles, Cal., and *M. R. Straw*, of Provo, for plaintiffs appellants.

*Booth & Booth*, of Provo, for intervening appellants.

*Wedgwood, Irvine & Thurman* and *Walton & Walton*, all of Salt Lake City, for respondents.

WEBER, J.

Plaintiffs and interveners, designated appellants here, have appealed from a judgment in favor of defendants. Appellants sought to foreclose certain mortgages upon the property of the Utah Lake Land, Water & Power Company, one of the defendants. The Utah Lake Land, Water & Power Company, hereinafter termed respondent, was incorporated in 1907 under the laws of Utah. It failed to pay the Utah state corporation license tax for the year 1914, and, pursuant to law, its right to do business was annulled and its charter was forfeited in 1915. Thereafter, in March, 1916, after its charter had been forfeited, the defunct corporation obtained control of the capital stock of the Los Angeles Mortgage Company, a California corporation, exchanging for the shares of stock

notes executed by respondent, which also executed mortgages on its property to secure the notes. The following abridgment of the pleadings and proceedings in the case to the time of trial is taken from appellants' brief:

"As appears from the original and first amended complaint, this suit was brought to enforce payment of and to foreclose two of the notes and mortgages, but in connection therewith the plaintiff's sought for and obtained the appointment of a receiver upon several grounds, among others, forfeiture of the company's charter under the state license tax, waste and mismanagement, and insolvency. The corporation appeared, and both by demurrer and answer challenged the validity of the notes and mortgages upon the grounds that they were not authorized corporate acts, and that they were executed at a time when the company's right to do business and its charter had been annulled. The first answer asserts that the obligations are void and not binding upon the corporation, both because the officer who acted was without authority in the premises, and because the corporation was in fact, under the license tax statute, nonexistent.

"The answer contains also a counterclaim under which the defendant charges the vendors of the stock with deceit with respect to the sale thereof, alleging that the stock as bought should have been worth about $75,000, but was actually worth much less, so that the defendant sustained damages in the sum of about $42,000.

"Upon the original and first amended complaint, and after an order overruling the demurrer and upon the answer of the defendants and a hearing had, the court appointed a receiver. After the appointment of the receiver and prior to the hearing on the merits the plaintiff Houston died, and his widow, as executrix, was substituted. Upon and in connection with this substitution she filed a complaint in intervention, setting up her note and mortgage, and praying for the enforcement thereof in the usual form. Two other owners of stock in the Los Angeles Mortgage Company, Messrs. Gore and Starr, sold their stock to the defendant at the same time and under the same circumstances in the same transaction as the plaintiffs, and they also, as interveners, set up and sought the enforcement of their notes and mortgages.

"At the hearing the plaintiff Loy filed another amended complaint. This preserves the essential features of both the original and first amended complaint, but sets up the Loy note and mortgage and asks for its enforcement with greater certainty and clearness than in either of the original pleadings.

"The defendants filed separate answers to the Houston intervention and the Loy amended complaint. In legal effect, however, they are substantially the same. The defendants filed separate an-

396        SUPREME COURT OF UTAH        [Dec.

Houston et al. v. Utah Lake Land, etc. Co., 55 Utah 393.

swers to the Gore and Starr interventions. These are not the same in fact or in legal effect as the answers filed to the Houston and Loy complaint, but in view of the proof actually received and the objections and rulings at the trial practically the same issues were raised in the Gore and Starr interventions as upon the other pleadings.

"The intervener Houston and plaintiff Loy filed replies. The defenses raised by the answers are in substance that, since the charter of the defendant corporation had been forfeited, it had ceased to exist, and could not act by an officer nor transact any business; that in any event the officer who assumed to act for the defendant corporation was not authorized and the transaction was not conducted or the papers executed in accordance with law; and, furthermore, that the purchase of stock in a foreign corporation was not authorized under the purpose clause of the corporation, and the note and mortgage executed as the purchase price of this stock was therefore ultra vires and void. These were the material defenses, although stated at length and in connection with some collateral and incidental matters. These defenses are reiterated in objections to the introduction of evidence.

"The replies in substance proceed upon the theory and allege that, if the charter was forfeited, or if the officer who acted was not duly authorized, or if the act was beyond the purpose clause, nevertheless the right to plead these defenses had been waived because of the failure of the corporation to rescind and because of its acts exercising ownership over and enjoying the benefits from the property received from the transaction, and also because the corporation had affirmed the contract, in place of rescinding it, by founding a claim for damages thereon both in its first answer in this suit and in an independent suit brought in Los Angeles; also that the transaction had been ratified by a long course of conduct inconsistent with disaffirmance such as the foregoing, and also because, the contract having been fully executed, and it being impossible to restore the plaintiff and interveners to their original position, and because of the full enjoyment by the corporation of the fruits of the transaction, the corporation would be estopped to plead any of the defenses asserted; also that the transaction was for the purpose of winding up the company, and thus authorized under the statute extending the life of forfeited charter corporations.

"At the trial all appellants offered in evidence the several notes and mortgages, first establishing as a preliminary the presidential signature of the corporation, the authenticity of the seal affixed, calling attention to the recitals in the mortgage that the corporation was an existing concern, and that the president was authorized, offering the resolutions of the board and stockholders empowering the president to conduct practically all business on behalf of the

company, including the sale and other disposition of all of its assets, the borrowing of money, the execution of notes and mortgages, and the entire minute book showing that up to the last meeting held by the board these resolutions were at practically each meeting affirmed and readopted. This proof, together with other evidence offered, was, upon objection made, excluded, whereupon all parties rested, and the court entered judgment dismissing all the complaints."

Numerous errors based upon exclusion of testimony are assigned, but the only question that need be considered, and which is decisive, is whether a corporation whose charter has been forfeited for the nonpayment of the state corporation license tax in this state may thereafter engage in new business and embark upon new enterprises. The statute (Comp. Laws Utah 1917, section 870 [chapter 10, page 14, Sess. Laws 1913]) provides:

"Any corporation, organized under the laws of the territory or state of Utah, whose franchise has heretofore expired or may hereafter expire by limitation or by forfeiture, may nevertheless continue for the purpose of winding up its affairs; and to effect this purpose may sell' or otherwise dispose of real and personal property, sue and be sued, contract, and exercise all other incidental and necessary powers."

It is argued by counsel for appellants that section 870 not only "extends the life of the corporation for the purpose of winding up its affairs," but that it is "a modification of or the creation of a new purpose clause," and that therefore "the question whether the transactions in question are beyond the powers of the corporation must be determined with reference to whether they occurred for the purpose of winding up the company." Mr. Whitney, the president of the Utah company, repeatedly made the statement in his deposition that "the purchase of the stock of the Los Angeles Mortgage Company was done for the purpose of winding up the affairs of the defendant corporation." Mr. Whitney's statement as to the purpose of the various transactions to which he testified is a bare conclusion. The undisputed facts are that a corporation that was dead for all purposes except for winding up its affairs purchased stock in a California corporation, took charge of that corporation, and engaged in a business

that was beyond the scope of its powers even before its civil death. Instead of winding up the affairs of the company, the testimony of Mr. Whitney indicated an attempt to resuscitate it. The purpose is well shown in the following excerpt from his testimony:

"If this Los Angeles Mortgage Company had been a going institution and a live wire, it was represented to me that I could sell mortgages, and that we could sell out the Utah land; we could get money enough to put the Utah project in shape, such as California people like to have them. They like cement ditches running to every 40, and that costs lots of money, and it was our idea to raise funds by mortgaging the property, building cement ditches, and then putting it on the market and selling it out."

Mr. Whitney, for the respondent, gave to Otho S. Houston, in exchange for stock in the Los Angeles Mortgage Company, a mortgage on respondent's property for $20,625, gave A. F. Starr a mortgage for the same consideration for $16,675, and to B. S. Gore, for the same consideration, a mortgage for $4,275, gave mortgages to the Los Angeles Mortgage Company amounting in all to $50,000, and a further mortgage to the Los Angeles company for $200,000. The $50,000 mortgage was in about 30 or 32 mortgages ranging from $500 to $2,000. The $200,000 mortgage was to be sold by a man by the name of Henderson, and the money used in improving the Utah lands of respondent, building concrete ditches and making other improvements, and then Henderson was to sell and rent the Utah land in forty or eighty-acre tracts. Mr. Whitney further testified:

"I sold bonds belonging to the Los Angeles Mortgage Company after acquiring the stock and realized $17,000. About $1,500 in interest has been paid on the notes. I advanced this for the company, and the company owes me. The defendant company owns the stock of the Los Angeles Mortgage Corporation. I had the corporation's seal with me for the purpose of executing papers for the defendant corporation in Los Angeles. In dealing with the plaintiffs I told them that the company had the right to do business and never knew or thought anything about the failure to pay the corporation tax. I was trying to close the company up and calculated to let the company die when I let the corporation tax die. The transaction with Houston and Loy was entered into for the purpose of winding up the company's affairs. I thought through the se-

curities of the Los Angeles Mortgage Company I could borrow $40,000 with which I would wind up the affairs of the company. I did not tell Houston and Loy that the corporation tax had not been paid, and I deliberately failed to pay that tax, and I thought I had a right to close up the business. The defendant corporation has everything I received except the bonds that were sold, and for them the corporation received $17,000 in cash. The stock the said corporation bought gave control over the assets of the Los Angeles Mortgage Company, and through this control the defendant corporation obtained the assets of that company as set out in the exhibits signed by me. I became president of the Los Angeles Mortgage Company, and for the defendant corporation acquired control of that company. The remaining assets of the Los Angeles corporation held by the defendant corporation are worth about $20,000."

Whatever may have been Mr. Whitney's purpose, his acts were designed and calculated not to wind up the affairs of the company, but to enlarge and extend its field of operation. To contend that these transactions had any tendency to close or wind up the business affairs of the Utah corporation is a mere juggle with words. It is utterly fallacious to say that a corporation by its corporate death is given everlasting corporate life; that a defunct corporation is endowed by law with enlarged and limitless powers, and that it may enter into realms of speculation from which it was excluded while it had full corporate existence. If in this case the corporation could buy the stock of a California corporation and engage in the loan business in California, it could as well engage in banking in Chicago or buy and operate an oil well in Wyoming. If the theory plausibly presented by appellants is tenable, a private corporation in this state desiring to enlarge and extend its powers may have its charter forfeited by failing to pay its annual state corporation license tax and then become a law unto itself, engage in any kind of business that may suit the fancy of its officers, and become a buccaneer on the high seas of finance. Such is not the purpose of the law. The evidence shows that the president of the respondent corporation was in 1911 given power by the board of directors to borrow money and execute notes and mortgages, and it is claimed that under those resolutions, which were never rescinded, he had authority to execute the notes and mortgages sued upon. How an

authority conferred during the lifetime of a corporation can be invoked as a justification for its acts after its corporate death, and while lingering only for the purpose of being wound up, is a question that is answered by its mere statement. Whatever authority the president of the corporation had by virtue of the resolution of the board of directors died with the corporation, and the fact that the officer could do those things necessary to wind up the affairs of the corporation does not justify the assumption that he had the power and authority that may possibly have vested in him before the charter of the corporation was forfeited. In the instant case it is not a question of ultra vires acts, as argued by appellants. An ultra vires act of a corporation is an act beyond the powers of the corporation. It is conceded by appellants that under the purpose clause the purchase of stock in another corporation would be beyond and outside the authorized business of the corporation, and therefore ultra vires. It is contended that, being ultra vires, the acts of the corporation in buying stock in the Los Angeles Mortgage Company could be ratified, and that they were ratified. It is unnecessary to discuss the question as to the effect of ultra vires corporate acts, because in this case the acts of the defunct corporation were more than ultra vires; they were wholly void, and not confirmable, and not a subject of ratification. The civilly dead corporation could not ratify those things that it had no authority and no power to do. It was neither a de jure nor a de facto corporation after the forfeiture of its charter. In 8 Fletcher's Cyc. Corp. section 5572, it is said:

"It is hardly necessary to state that a corporation which has been dissolved cannot continue business as a going concern. This is so, even though a statute continues its existence for a definite or indefinite time to wind up the business."

Referring to a statute providing that a corporation may, after its dissolution, continue for the purpose of winding up its business, the same author, at section 5636, says:

"But such a statute does not authorize it to engage in any new business transactions."

See, also, 7 R. C. L. section 757, page 743.

Where a corporation's charter is forfeited in this state, it is the duty of the directors, who are trustees for the stockholders and creditors, to assemble its assets, liquidate its indebtedness, and generally conduct its affairs in such manner as will properly expedite the winding up of the corporation's business. No such course was pursued in this case.

*Henriod* v. *East Tintic Development Co.* 52 Utah 245, 173 Pac. 134, is of no avail to appellants. In that case there was a mortgage upon the property of the corporation, and the board of directors authorized a confession of judgment on the mortgage indebtedness to prevent foreclosure, and after the property of the company was sold to satisfy the indebtedness the board of directors sold the company's equity of redemption, paid off all the outstanding indebtedness of the company, and distributed what remained in their hands among the stockholders who had not forfeited their shares of stock. The corporation did not engage in new business, and the acts of the directors were clearly for the purpose of winding up the affairs of the corporation. Speaking of the failure to pay the corporation tax for the year 1914, the court said:

"By reason of that fact its charter was forfeited in April, 1915, and thereafter it could no longer legally carry on the business for which it was organized."

Nor can those who deal with a defunct corporation and with its trustees say that they were innocent parties to the transaction and were ignorant of the status of the corporation. The proclamation of the Governor of this estate forfeiting the charter of the Utah Lake Land, Water & Power Company in 1915 was notice to all of the world that thereafter, unless reinstated within the time by law provided, that corporation had no right and no power to engage in any business whatever except such as would be necessary for the purpose of winding up its affairs.

The receiver of the defunct corporation has in his possession the shares of stock obtained from appellants; respondent has in its answer tendered the stock to them, and they are entitled to it from the receiver. The record shows that the Utah Lake Land, Water & Power Company received money

from the treasury of the Los Angeles Mortgage Company, but that company is not a party here. If money was wrongfully transferred from the treasury of the Los Angeles company to the respondent's treasury, that fact makes the California corporation a creditor of defendant corporation, but such facts are not relevant to any issues in this case. Whatever claims the Los Angeles Mortgage Company may have for money had and obtained cannot be adjudicated in this proceeding. That money belongs to the mortgage company, not to plaintiffs and interveners.

Judgment affirmed, with costs to respondents.

CORFMAN, C. J., and FRICK, GIDEON, and THUR-MAN, JJ., concur.