**Brian T. MURPHY and Shelly F. Murphy, Plaintiffs, Appellants, and Cross–Appellees,**

v.

**Todd CROSLAND; Jeff Crosland, Defendants, Appellees, and Cross–Appellants.**

**No. 930249–CA.**

Court of Appeals of Utah.

Nov. 23, 1994.

Scott B. Mitchell, Salt Lake City, for appellants.

Ellen Maycock, David C. Wright, David W. Scofield, and Ronald F. Price, Salt Lake City, for appellees.

Before BILLINGS, GREENWOOD and JACKSON, JJ.

## OPINION

JACKSON, Judge:

Brian and Shelly Murphy appeal a grant of summary judgment in favor of Todd Crosland. In addition, Jeff Crosland appeals the grant of summary judgment against him in favor of the Murphys. We reverse the summary judgment in favor of Todd Crosland and affirm the summary judgment against Jeff Crosland.

## BACKGROUND

Crosland Industries, Inc. (CI) was properly incorporated in Utah on January 28, 1986. At all times relevant to this appeal, Todd Crosland was president, a director, and principal shareholder of CI, while Jeff Crosland was vice president and a director.

On March 1, 1987, CI's certificate of incorporation was suspended pursuant to Utah Code Ann. § 16–10–88.2 (1987) (repealed 1992) for failure to file its annual report.

The Murphys owned Granny's Buns, a cinnamon roll store in Las Vegas, Nevada. On January 8, 1988, the Murphys entered into a contract to sell Granny's Buns to Arnold Swenson. On that date, Mr. Swenson executed a promissory note in the Murphys' favor for a principal amount of $70,000. On that same date, and during the period of its

suspension, CI agreed to guarantee Mr. Swenson's performance on both the sales contract and the note. Todd Crosland negotiated the guarantees on CI's behalf, and Jeff Crosland executed the guarantees in his capacity as an officer of CI.

Subsequently, Mr. Swenson defaulted under the terms of both the sales contract and the note, and CI failed to honor its guarantees. Having failed to remedy its suspended status and to restore its good standing, CI was involuntarily dissolved on March 1, 1988, pursuant to Utah Code Ann. § 16–10–88.2 (1987) (repealed 1992).

On July 27, 1989, the Murphys obtained a default judgment against CI in the amount of $72,987.46 plus interest, resulting from CI's failure to honor the guarantees. The Murphys then brought the present suit seeking to hold Todd and Jeff Crosland jointly and severally liable, under Utah Code Ann. § 16–10–139 (1987) (repealed 1992), for the judgment against CI. The Murphys claimed that by negotiating, authorizing, and executing CI's guarantees while the corporation was suspended, the Croslands "assumed to act as a corporation without authority so to do" in violation of Utah Code Ann. § 16–10–139.

The Murphys filed a motion for summary judgment against the Croslands. Judge Daniels granted summary judgment against Jeff Crosland for his role in executing the agreements, but denied the motion with respect to Todd Crosland. Later, Judge Iwasaki granted Todd Crosland's motion for summary judgment against the Murphys. The Murphys and Jeff Crosland appeal the respective grants of summary judgment against them.

## ISSUE AND STANDARD OF REVIEW

The sole issue on appeal is whether Jeff and Todd Crosland, by negotiating, authorizing, and executing CI's guarantees while the corporation was suspended, assumed to act as a corporation without authority, and thereby became jointly and severally liable for the judgment entered against CI as a result of their actions.[1] In order to address this issue, we must interpret sections 16–10–139 and 16–10–88.2 of the Utah Code to determine how and when these two statutes apply and whether they can properly interact and apply together.

Based on the undisputed facts, Judge Daniels held that section 16–10–139 applied to those who transacted business for the suspended corporation, while Judge Iwasaki held that it did not. "The correct interpretation of a statute is a question of law and is reviewed for correctness." *State v. Larsen*, 865 P.2d 1355, 1357 (Utah 1993); *accord Ong Int'l (U.S.A.), Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 455 (Utah 1993).

## ANALYSIS

### I. Development of the MBCA

"In the United States the granting of corporate franchises has been regarded from the beginning as a prerogative of the legislature. The early American corporations were chartered by special acts of state legislatures." Model Business Corp. Act Ann., § 1 cmt., at 2 (1971). Later, "a procedure for incorporating under laws of general application was developed." *Id.* at 2–3.

The general laws enacted throughout the country shared similarities, but varied from state to state in scope and structure. Indeed, several states began to take advantage of these differences, enacting competitive statutes intended to induce corporations to organize in their jurisdictions. *Id.* at 3.

In addition, several common law concepts developed in the area of corporate law, supplementing the statutes. For example, "[a]t common law, corporations could be either de jure, de facto, or by estoppel." *American Vending Servs., Inc. v. Morse*, 881 P.2d 917, 920 (Utah App.1994).

A de jure corporation is ordinarily thought of as one which has been created as the result of compliance with all of the constitutional or statutory requirements of

---

1. Todd Crosland also claims that the Murphys' appeal was not timely filed, but this court already decided that issue in its order refusing to grant Todd Crosland's motion to dismiss the appeal. We consider that order to be the "law of the case" with respect to the timeliness of the appeal. *See Mascaro v. Davis*, 741 P.2d 938, 946–47 (Utah 1987).

a particular governmental entity. A de facto corporation, on the other hand, can be brought into being when it can be shown that a bona fide and colorable attempt has been made to create a corporation, even though the efforts at incorporation can be shown to be irregular, informal or even defective.

Corporations by estoppel come about when the parties thereto are estopped from denying a corporate existence. In other words, the parties may, by their agreements or conduct, estop themselves from denying the existence of the corporation.

*Id.* (quoting *Harris v. Stephens Wholesale Bldg. Supply Co.*, 54 Ala.App. 405, 309 So.2d 115, 117–18 (1975)).

Beginning in the late 1920s, the states began to modernize their corporation laws by enacting entirely new statutes. Model Business Corp. Act Ann., § 1 cmt., at 3 (1971). As part of this revisionary movement, a committee of the American Bar Association drafted the Model Business Corporation Act (MBCA), first published as a complete act in 1950. *Id.* "The MBCA strove to codify a uniform set of laws regarding corporations and to provide some clarity and bright-line tests to previously clouded areas." *Morse*, 881 P.2d at 921.[2] Furthermore, the MBCA eliminated the common law concepts of de facto corporations, de jure corporations, and corporations by estoppel. *See* 3A William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 1229 (1990) (Fletcher).[3]

## II. MBCA's Relevant Scheme

The provisions of the MBCA relevant to this case are sections 94, 135, and 146. Sec-

tion 146 provides for individual liability for the unauthorized assumption of corporate powers, while sections 94 and 135 set forth the penalties imposed upon corporations who fail to file their annual reports.

Section 146 establishes that "[a]ll persons who assume to act as a corporation without authority so to do shall be jointly and severally liable for all debts and liabilities incurred or arising as a result thereof." Model Business Corp. Act Ann., § 146 (1971). The comment to section 146 indicates that

[t]his section is designed to prohibit the application of any theory of de facto incorporation. The only authority to act as a corporation under the Model Act arises from completion of the procedures prescribed in [the Act.] The consequences of those procedures are specified ... as being the creation of a corporation. No other means being authorized, the effect of section 146 is to negate the possibility of a de facto corporation.

Abolition of the concept of de facto incorporation, which at best was fuzzy, is a sound result. No reason exists for its continuance under general corporate laws, where the process of acquiring de jure incorporation is both simple and clear. The vestigial appendage should be removed.

*Id.* § 146 cmt., at 908–09 (1971). This comment clearly demonstrates the MBCA's underlying intent to abolish de facto corporations and to hold liable individuals who assume to act as a corporation before the corporation actually exists.[4]

When a corporation fails to timely file an annual report, section 135 of the MBCA imposes a monetary penalty equal to ten per-

---

**2.** "Adoption of the Model Act substantially in whole [or] in large part by [30 jurisdictions within the first 20 years following its publication] is evidence of its usefulness as a legislative revision tool and as an instrument conducive to uniformity in an area where interstate operation is commonplace." Model Business Corp. Act Ann. at xiii (1971).

**3.** This intent on the part of the drafters of the MBCA to eliminate these common law doctrines is further evidenced in the official comments to the Revised Model Business Corporation Act (RMBCA) in which the authors of the comments

express dismay that "even in states with such statutes [patterned after the MBCA,] courts have continued to rely on common law concepts of de facto corporations, de jure corporations, and corporations by estoppel." Rev. Model Business Corp. Act Ann., § 2.04 cmt.

**4.** Indeed, the RMBCA now expressly holds liable "[a]ll persons purporting to act as or on behalf of a corporation, knowing *there was no incorporation* under this Act." Rev. Model Business Corp. Act Ann., § 2.04 (1991) (emphasis added).

cent of the franchise tax assessed against the corporation during the appropriate time period. *Id.* § 135. Section 94 of the MBCA, however, mandates a harsher penalty. This section provides that "[a] corporation may be dissolved involuntarily ... when it is established that ... [t]he corporation has failed to file its annual report within the time required by this Act." *Id.* § 94. In essence, this "procedure is a policing action that provides a means by which the state may insure compliance with and nonabuse of the fundamentals of corporate existence." *Id.* § 94 cmt.

Dissolution has always carried severe consequences, not the least of which is the end of the corporation. Furthermore, the directors, officers, and shareholders risk exposure to personal liability if the corporation continues to carry on business. Statutes and case law have traditionally held that after dissolution by operation of law, the corporation could continue to exist and operate for the limited purpose of winding up its affairs. *See* 72 A.L.R.4th 419, 425 (1989); Fletcher §§ 8166–8173.[5] However, the majority rule, which accords with the rule at common law, is that by continuation of the business without contemplation of liquidation, the directors and officers are held personally responsible for contract and tort liability incurred during the period following dissolution. Fletcher § 8132.1; *see, e.g., Consolidated Mills & Feed Yards Co. v. Patterson,* 62 Utah 506, 221 P. 159, 160 (1923) (holding directors who continued to transact business after forfeiture of corporate charter became personally liable for debts which they contracted because they exceeded authority remaining to wind up corporation). Additionally, the shareholders may also "become liable as partners where they agree to continue the business after dissolution, or participate in such continued business." Fletcher § 8132.

The common law protections generally available in the case of preincorporation de-

fects, such as de facto corporation, simply did not apply to dissolved corporations. "No corporation de facto could exist under the common law where the corporation's charter had been revoked by judicial decree or statutory forfeiture [amounting to involuntary dissolution]." *Id.* § 3844. "According to a number of cases, a corporation which has been dissolved ... is not even a de facto corporation for the reason that there can be no corporation de facto when there cannot be a corporation de jure, and that there can be no color of corporate existence after the corporate death." 19 Am.Jur.2d § 2885 (1986). As a result, the common law held directors, officers, and shareholders of a dissolved corporation personally liable and afforded them no protection under the guise of de facto corporation when they exceeded the scope of their authority to wind up business.

Accordingly, the MBCA contemplated three relevant periods in the life of a corporation: (1) the preincorporation period—during which those who assumed corporate powers would be held personally liable under the MBCA, thereby negating the doctrines of de facto corporation and corporation by estoppel; (2) the incorporation period—during which the corporation enjoyed all the powers, rights, and privileges conferred by law; and (3) the postdissolution period—for which no statutory change was made because the common law already held personally liable those who carried on the business in an unauthorized manner. The MBCA's scheme did not include corporate suspension as a step prior to dissolution; hence, the MBCA's drafters had no need to consider the effect of any of the Act's provisions on a corporation that had been suspended.

### III. Utah's Corporation Act

In Utah, corporate formation and all its attendant formalities were governed by the Utah Business Corporation Act (UBCA).[6]

---

5. In fact, the Utah Supreme Court imposed a common law duty upon the directors of an involuntarily dissolved corporation "to assemble its assets, liquidate its indebtedness, and generally conduct its affairs in such manner as will properly expedite the winding up of the corporation's business." *Houston v. Utah Lake Land, Water & Power Co.,* 187 P. 174, 177 (Utah 1919).

6. Utah Code Ann. §§ 16–10–1 to –148 (1991) (repealed 1992). In 1992, the Utah Legislature enacted the Revised Business Corporation Act, Utah Code Ann. §§ 16–10A–101 to –1705 (Supp. 1994), patterned after the RMBCA.

Indeed, the UBCA, enacted in 1961, was patterned after the MBCA with few changes. The UBCA sections relevant to the issues of this case are sections 16–10–139 and 16–10–88.1 to 16–10–88.2 (repealed 1992), as they were in effect prior to the 1990 amendments.[7]

Section 16–10–139 follows the exact wording of MBCA section 146: "All persons who assume to act as a corporation without authority so to do shall be jointly and severally liable for all debts and liabilities incurred or arising as a result thereof." Utah Code Ann. § 16–10–139 (1987) (repealed 1992). However, nothing in the MBCA remotely resembles sections 16–10–88.1 and 16–10–88.2 of the UBCA. Section 16–10–88.1 provides that "[a] domestic corporation is considered delinquent if . . . it does not file an annual report within the time prescribed. . . . The Division of Corporations and Commercial Code shall mail a notice of delinquency to each delinquent corporation." Utah Code Ann. § 16–10–88.1 (1987) (repealed 1992). Section 16–10–88.2 then applies, providing that "[a] domestic corporation that remains delinquent for more than 30 days after the mailing of the notice of delinquency . . . shall be suspended. . . . If the corporation does not remove the suspension within one year after the date of mailing the notice of suspension, the corporation shall be dissolved." Utah Code Ann. § 16–10–88.2 (1987) (repealed 1992).

Corporate suspension, as a procedural step prior to involuntary dissolution, was never part of the MBCA scheme; however, since 1931, a Utah corporation could be suspended for nonpayment of its taxes. When the Utah Legislature enacted the UBCA in 1961, it modeled section 16–10–89 after section 94 of the MBCA, except that the legislature also recognized corporate suspension as grounds for involuntary dissolution: "A corporation may be dissolved involuntarily . . . when it is established that . . . [t]he corporation has failed to file its annual report within the time required by this act, or its corporate powers, rights and privileges have been suspended [for nonpayment of taxes]." Utah Code Ann. § 16–10–89 (1972) (repealed 1992).

In 1973, the Utah Legislature made suspension a necessary step leading to dissolution not only for nonpayment of taxes but also for failure to file an annual report after receiving notice of delinquency. *See* 1973 Utah Laws ch. 20, § 1.[8] Until this time, dissolution had been the penalty for failure to file an annual report, the same as prescribed by the MBCA. After this time, and during the period when the events relevant to the present case occurred, a corporation that failed to file its annual report after receiving a notice of delinquency was first suspended and later dissolved if the suspension was not cured.

In this case, we must resolve how sections 16–10–139 and 16–10–88.2 of the UBCA interact to determine (1) whether corporate suspension for failure to file an annual report somehow removes or restricts a corporation's authority to conduct business, and (2) whether officers, directors, and shareholders who continue to conduct business after suspension can be held personally liable for such acts. Accordingly, we must interpret section 16–10–139 to determine whether it applies only to eliminate de facto corporations, or other preincorporation defenses, or whether it applies to any situation in which persons assume to act without corporate authority, before *or after* incorporation. Next, we must interpret section 16–10–88.2 to determine what effect, if any, suspension has on a corporation's authority.

 When faced with a question of statutory construction, we first examine the plain language of the statute. *State v. Larsen*, 865 P.2d 1355, 1357 (Utah 1993). We will resort to other methods of statutory interpretation only if we determine that the language is ambiguous. *State v. Vigil*, 842 P.2d 843, 845 (Utah 1992); *Brittain v. State*, 882 P.2d 666, 670 (Utah App.1994). Thus, when statutory language is plain and unambiguous, we will not look beyond the same to divine legislative

---

7. The matters of primary concern to the plaintiffs' action occurred between March 1987 and February 1989.

8. Suspension also applied to some of the other grounds which previously led directly to involuntary dissolution. *See* 1973 Utah Laws ch. 20, § 1.

intent. *Brinkerhoff v. Forsyth,* 779 P.2d 685, 686 (Utah 1989). Additionally, we must assume "that each term in the statute was used advisedly; thus the statutory words are read literally, unless such a reading is unreasonably confused or inoperable." *Savage Indus., Inc. v. State Tax Comm'n,* 811 P.2d 664, 670 (Utah 1991). Finally,

> where there is an ambiguity or uncertainty in a portion of a statute, it is proper to look to an entire act in order to discern its meaning and intent; and if it is reasonably susceptible of different interpretations, the one should be chosen which best harmonizes with its general purpose.

*Grant v. Utah State Land Bd.,* 26 Utah 2d 100, 485 P.2d 1035, 1037 (1971).

### IV. Section 16–10–139

■ The plain and unambiguous language of section 16–10–139 would hold liable "[a]ll persons who assume to act as a corporation without authority so to do." Utah Code Ann. § 16–10–139 (1991) (repealed 1992). This provision clearly contemplates liability for anyone who, without authority to do so, purports to act as a corporation or on behalf of a corporation.[9]

Nothing in section 16–10–139 limits liability to those who have failed to incorporate or who have yet to receive a certificate of incorporation. Interpreting an identical provision, the Tennessee Court of Appeals noted that the legislature "saw fit to place statutory liability upon those who assume to act as a corporation without authority.... No exceptions are contained in" the statute. *Thompson & Green Mach. Co. v. Music City Lumber Co.,* 683 S.W.2d 340, 345 (Tenn.Ct. App.1984). Thus, if a corporation has not authorized a person to act on its behalf, that person is without authority under section 16–10–139. Similarly, if a corporation does not have authority to conduct business, either because it has not been properly incorporated or because its right to conduct business has been suspended, then its agents are also without authority and section 16–10–139 applies.

The Croslands contend that section 16–10–139 does not apply to properly incorporated corporations—de jure corporations—but only to de facto corporations. The Croslands rely on comments accompanying MBCA section 146, stating that "[t]his section is designed to prohibit the application of any theory of de facto corporation" and that "the effect of section 146 is to negate the possibility of a de facto corporation." Model Business Corp. Act Ann., § 146 cmt., at 908 (1971).

Even if the Croslands' narrow reading of the comments is correct,[10] we will not look beyond unambiguous statutory language "to divine legislative intent." *Brinkerhoff v. Forsyth,* 779 P.2d 685, 686 (Utah 1989). Further, these specific comments were written in 1969, eight years after Utah adopted the statute; thus, to conclude that the Utah Legislature's intent paralleled that of the MBCA drafters is a bit of a stretch. Also, the MBCA drafters never considered this

---

9. The only possible ambiguity in the statute exists with the words "assume to act." The majority position in *American Vending Servs., Inc. v. Morse,* 881 P.2d 917 (Utah App.1994), appears to read such language to apply to all who "act" as a corporation regardless of the actor's knowledge. *Morse,* 881 P.2d at 920 (Judge Garff's concurring opinion represents majority view on applicability of section 16–10–139 to corporation by estoppel doctrine). Judge Greenwood relied on an interpretation different from the majority:

> The [Florida] court found significant that the statute does not impose liability on all those who "act," but only on those who "assume to act." Based on this distinction, the Florida court concluded that "the use of this language reflects an intent to limit the statute's application to those persons who knew or, because of their position, should have known" that the corporation did not [have authority].... I agree with this reasoning and would hold that

> ... [when] neither party has actual or constructive knowledge [the doctrine of corporation by estoppel can coexist with section 16–10–139].

*Id.* at 925. In the present case, the Croslands fall within the scope of the statute under either interpretation of "assume to act." Todd and Jeff Crosland acted either with actual knowledge or—by virtue of Todd Crosland's positions as president and director and Jeff Crosland's positions as vice president and director—with constructive knowledge.

10. The comments do not state that the *sole* aim of this section is to abolish de facto corporations. *See supra* note 3. Though that may be the main aim, it is equally appropriate to apply the section to other situations when actors lack corporate authority.

section's applicability to suspension or other postincorporation situations.

Also, applicable case law does not support the Croslands' contentions. They rely on *Gillham Advertising Agency, Inc. v. Ipson*, 567 P.2d 163 (Utah 1977), *Sterling Press v. Pettit*, 580 P.2d 599 (Utah 1978), and even *Morse*, 881 P.2d at 918, for their conclusion that UBCA section 16–10–139 should only apply to de facto corporations. The majority view in *Gillham* can be read to hold that a corporate president was personally liable on a debt because (1) he signed for it in his individual, rather than representative, capacity; (2) he signed for it as a representative of an existing Utah corporation of which he was not president; or (3) he signed for it as a representative of a Nevada corporation that had been suspended in that state.[11] *See Gillham*, 567 P.2d at 164–65. Regardless of the ground on which the supreme court based its decision, the court did not hold that section 16–10–139 applies only to de facto corporations. Neither can such a conclusion be drawn from *Sterling Press*, 580 P.2d at 600 (holding defendants liable under section 16–10–139 because they purported to act for valid corporation when in fact they acted for company that was neither incorporated nor registered as trade name of valid corporation), or *Morse*, 881 P.2d at 920, 927–928 (holding that UBCA section 16–10–139 eliminated doctrines of de facto corporation and corporation by estoppel, implying that section 16–10–139 applies to more than just de facto corporations).

Other jurisdictions which have adopted similar or identical statutes hold the view that section 16–10–139 applies to situations in which a corporation's authority has been restricted or terminated even *after* proper incorporation. For example, the Mississippi Supreme Court held that a corporate owner/officer was personally liable, under a statute identical to section 16–10–139, for continuing business while the corporation was suspended. *Carolina Transformer Co. v. Anderson*, 341 So.2d 1327, 1329–30 (Miss. 1977); *see also T–K Distribs., Inc. v. Soldevere*, 146 Ariz. 150, 704 P.2d 280 (1985) (holding principal stockholders individually liable, under Arizona's equivalent to section 16–10–139, for acts during period of revocation of corporate authority before reinstatement); *Anderson v. Hillsborough Sheet Metal, Inc.*, 513 So.2d 1359 (Fla.Dist.Ct.App.1987) (holding president of involuntarily dissolved corporation liable, under Florida's equivalent to section 16–10–139, for continuing to buy materials on credit in corporate name); *Estate of Plepel v. Industrial Metals, Inc.*, 115 Ill. App.3d 803, 71 Ill.Dec. 365, 450 N.E.2d 1244 (1983) (holding corporate president liable, and reasoning that Illinois' equivalent to section 16–10–139 applied, when president incurred debts for corporation between dissolution and reinstatement); *Kessler Distrib. Co. v. Neill*, 317 N.W.2d 519 (Iowa Ct.App.1982) (holding corporation's president liable, under Iowa's equivalent to section 16–10–139, for transacting business in Iowa after corporate charter was forfeited or revoked in Missouri).[12]

**11.** The majority made only passing mention of § 16–10–139 at the end of the opinion; it is unclear how the statute figured into the court's analysis. *See Gillham*, 567 P.2d at 165. The dissent argued that the defendant signed in a representative capacity, so he would be liable only if the Nevada corporate charter was suspended or forfeited before he did business with the plaintiffs. *See id.* at 165–67 (Maughan, J., dissenting). The Tenth Circuit seemed unclear about how to interpret *Gillham*. *See Loveridge v. Dreagoux*, 678 F.2d 870, 877–78 (10th Cir.1982).

**12.** The Croslands rely on several cases that do not apply to UBCA § 16–10–139. In *Micciche v. Billings*, 727 P.2d 367 (Colo.1986), the Colorado Supreme Court held that Colorado's equivalent to § 16–10–139 did not hold corporate officers personally liable for obligations incurred while the corporation was suspended for not filing the

corporate report; instead, the statute was limited to times when persons acted as a corporation "without making any bona fide effort to achieve corporate status." *Id.* at 371–72.

Nevertheless, *Micciche* is distinguishable from the present case. First, the Colorado court turned to "legislative intent [as] the guiding principle of statutory construction," relying heavily on the MBCA comments. *Id.* at 371. In contrast, Utah courts look first to a statute's plain language to discern its meaning. In any case, as discussed previously, the MBCA comments are not helpful here. Furthermore, prior versions of the Colorado Corporation Code specifically imposed personal liability on officers and directors for corporate debts if the corporation did not file a corporate report. *Id.* at 372. While the Colorado Corporation Code at the time of *Micciche* provided the penalty of suspension for not filing

Finally, our conclusion that section 16–10–139 applies to suspended corporations is consistent with at least one significant purpose of the statute. When the doctrines of de facto corporation or corporation by estoppel were effective in Utah, a party dealing with a corporation had to examine state records to determine whether a valid certificate of incorporation had been issued. If the party did not do so, the doctrines prevented that party from recovering from the "corporate" actors' personal assets for any liability arising from the dealings even though the actors did not have genuine corporate authority at the time. After the enactment of section 16–10–139, parties no longer had to protect themselves by determining whether a certificate of incorporation had been issued. It is illogical to eliminate the duty of those dealing with a corporation to check the records for faulty or failed incorporation, while continuing to require such persons to examine the records for assurance that they are dealing with a corporation in good standing whose authority to conduct business has not been suspended.

Thus, we conclude that UBCA section 16–10–139 applies to those who assume to act as or on behalf of a corporation without authority to conduct business, either because it has not been properly incorporated or because its authority has been suspended.

## V. Section 16–10–88.2

According to the above analysis, the Croslands are personally liable if suspension of the certificate of incorporation suspends or otherwise limits a corporation's authority to do business. Therefore, we must decide what effect, if any, certificate suspension has on a corporation's authority.

The plain language of UBCA section 16–10–88.2 is more ambiguous than the wording of section 16–10–139. Section 16–10–88.2 provides that

[a] domestic corporation that remains delinquent for more than 30 days after the mailing of the notice of delinquency ... shall be suspended. If a corporation is suspended under this section or under Section 59–7–155, the division shall mail a notice of suspension to the corporation, ... stat[ing] that the certificate of incorporation ... has been suspended.

Utah Code Ann. § 16–10–88.2(1), (2)(a) (1991) (repealed 1992). "Suspend" commonly means "to debar temporarily from a privilege, office, or function." Webster's Ninth New Collegiate Dictionary 1189 (1986). *Black's Law Dictionary* defines "suspend" as follows: "to discontinue temporarily, but with an expectation or purpose of resumption." Black's Law Dictionary 1446 (6th ed. 1990). The Utah Supreme Court has held that "the term 'suspended' itself imports a temporary restriction of function." *Mackay & Knobel Enters. v. Teton Van Gas, Inc.*, 23 Utah 2d 200, 203, 460 P.2d 828, 829 (1969).

Even so, the statutory language does not specify the effect of suspending the certificate of incorporation.[13] Issuance of a certifi-

a corporate report, the current code expressly repealed the statutory penalty of personal liability for this violation. *Id.* The Colorado court concluded that if the legislature had intended for personal liability of "officers of a validly formed but suspended corporation, it is reasonable to assume that it would have made its intent as clear as it had done in prior enactments." *Id.* Here, the Utah Legislature has not expressly repealed a statutory provision for personal liability when a corporation fails to file its annual report.

Two additional cases upon which the Croslands rely are also distinguishable: *Creditors Protective Ass'n v. Baksay*, 32 Or.App. 223, 573 P.2d 766 (1978), and *Tagliani v. Colwell*, 10 Wash. App. 227, 517 P.2d 207 (1973). *Baksay* is distinguishable because the Oregon statute held liable "all persons who assume to act as a corporation *without authority of a certificate of incorporation issued by the Corporation Commissioner,*" leading the court to conclude that the statute imposed personal liability only when the incorporators did not meet all conditions precedent to valid incorporation. *Baksay*, 573 P.2d at 768 & n. 1 (emphasis added). *Tagliani* is distinguishable because no suspension of corporate authority was involved; the defendants' failure to pay corporate fees was punishable only by civil fines and criminal penalties, leading to the court's conclusion that Washington's equivalent to § 16–10–139 did not impose personal liability unless the corporation had ceased to exist. *Tagliani*, 517 P.2d at 209–10.

13. Other state suspension statutes have been clearer in their intended effect. *See, e.g.,* Colo. Rev.Stat. § 7–10–109(2) (repealed 1994) (providing that "any domestic corporation which is suspended ... shall be inoperative and no longer competent to transact business in this state");

cate of incorporation signals the beginning of corporate existence. Utah Code Ann. § 16–10–51 (1991) (repealed 1992). However, because suspension is a temporary condition, suspension of a certificate cannot mean the end of corporate existence. Indeed, corporate suspension under another statute was construed to be "something less than the termination of the corporate life as brought about by dissolution." *Mackay & Knobel Enters.*, 460 P.2d at 829. Nevertheless, suspension under section 16–10–88.2 must have *some* effect on a corporation. We look to the statute as a whole to determine its meaning and intent and interpret each section to harmonize with the statute's general purpose. *See Grant v. Utah State Land Bd.*, 26 Utah 2d 100, 103, 485 P.2d 1035, 1037 (1971).

Because the legislature created separate steps of delinquency, suspension, and dissolution, we conclude each was meant to have a different effect. A corporation was delinquent if it did not timely fulfill certain obligations (e.g., filing an annual report). Utah Code Ann. § 16–10–88.1(1) (1991) (repealed 1992). Notice of delinquency was sent to the corporation, warning "that the corporation [would] be suspended, unless it correct[ed] the delinquency ... within 30 days of the mailing of [this] notice." *Id.* at 16–10–88.1(2). Delinquency apparently had no effect except to notify the corporation that it had not met an obligation and must rectify the situation or be suspended. Thus, suspension had an effect distinct from mere delinquency. Further, corporate dissolution would follow one year after mailing the notice of suspension unless the corporation removed the suspension before then. Utah

Code Ann. § 16–10–88.2(4) (Supp.1987) (repealed 1992). Thus, the legislature must have meant suspension to be something less than dissolution or termination of corporate existence.

■ We conclude that corporate suspension was intended to affect a corporation's authority, but not its existence. Authority and existence are not the same concept, a fact that seems to confuse the Croslands. A corporation may continue to exist as an entity distinct from its shareholders and, at the same time, be restricted from conducting business as usual.[14] The 1990 amendments to section 16–10–88.2 support our view of the effect of suspension: "A corporation that is suspended continues its corporate existence and may carry on any business so long as it also takes the necessary steps to remedy its suspended status and restore the corporation to good standing." Utah Code Ann. § 16–10–88.2(1) (1991) (repealed 1992) (suggesting that corporation may not do business as usual if it merely lapses into dissolution).[15]

An analogous statute, referred to in UBCA section 16–10–88.2, is helpful in determining the meaning of suspension here. Section 16–10–88.2 provides that "[i]f a corporation is suspended under this section or under Section 59–7–155, the division shall mail a notice ... stat[ing] that the certificate of incorporation ... has been suspended." Utah Code Ann. § 16–10–88.2(1), (2)(a) (1991) (repealed 1992). Section 59–7–155 provides that

> [i]f a tax computed and levied under this chapter [regarding corporate franchise and income taxes] is not paid ... on the last day of the 11th month after the date of

---

Idaho Code § 30–1–135 (1980) (providing that "it shall be unlawful for any forfeited domestic ... corporation [equivalent to suspended corporation in Utah] to exercise its corporate powers or to transact any business in this state").

**14.** This has been, and still is, the case with a dissolved corporation. "A dissolved corporation continues its corporate existence but may not carry on any business except that appropriate to wind up and liquidate its business and affairs...." Utah Code Ann. § 16–10a–1405 (Supp.1994). The corporation continues to exist, but its authority is restricted. Once a corporation completes the winding up process, its corporate existence is terminated.

**15.** The 1990 amendments are not binding here. Still, the Murphys suggest that the amendments show how the legislature always intended suspension to affect corporations. On the other hand, the Croslands suggest that the amendments are the first attempt to limit a suspended corporation's activities and that, before the amendments, a suspended corporation could transact business unconditionally. We choose a third interpretation: The amendments reduce the harsh effect of corporate suspension by letting a suspended corporation conduct business as usual if it also takes steps to remedy the suspension; before the amendments, business as usual was not permitted.

delinquency, the corporate powers, rights, and privileges of the delinquent taxpayer, if it is a domestic corporation, shall be suspended.

Utah Code Ann. § 59–7–155 (1992). This statute has been virtually the same since it was enacted in 1931. *See* 1931 Utah Laws ch. 39, § 63. The legislature has known since then of the effect of corporate suspension under the state's tax laws. When suspension first became a prelude to dissolution under the UBCA, the legislature provided that the same notice be sent to a corporation "[u]pon suspension of the certificate of incorporation of a corporation under [the UBCA] section or under [the corporate tax] section." 1973 Utah Laws ch. 20, § 1. At the time relevant to this case, the same notice that the certificate of incorporation had been suspended would have been sent to a corporation suspended under either section. It is unlikely that the legislature intended "suspension of the certificate" to have one effect for a corporation suspended for failing to pay taxes and another effect for a corporation suspended for not filing an annual report. Because the meaning of corporate suspension was the same for more than forty years before suspension became a penalty for not filing an annual report, the legislature surely would have provided a different definition for suspension under the UBCA had it so intended.[16] We therefore conclude that suspension under UBCA section 16–10–88.2 had the same effect as suspension of the corporate powers, rights, and privileges under section 59–7–155.

The Utah Supreme Court held that suspension under the tax statute imposed a "temporary restriction of function of the corporation." *Mackay & Knobel Enters.*, 460 P.2d at 829. It further concluded that a suspended corporation "cannot engage in carrying forward its business." *Id.* However, the court also stated that a suspended corporation could at least engage in the same conduct as a corporation going through dissolution (e.g., protecting its assets,[17] paying its creditors, and otherwise winding up its business). *Id.* Thus, we conclude that a corporation suspended under section 16–10–88.2 may engage in business activities allowed during winding-up and in business necessary to remedy the corporation's suspended status.[18] However, a suspended corporation does not have authority to conduct business as usual.

This interpretation is compatible with the general purpose of the statute. The basic objective in suspending a corporation is to compel the corporation to meet its delinquent obligation. *See, e.g., id.* at 830; *United States v. Standard Beauty Supply Stores*, 561 F.2d 774, 776 (9th Cir.1977) (stating statute suspending corporate powers for not paying taxes was meant to put "additional bite" into tax collection); *Bank of Am. Nat'l Trust & Sav. Ass'n v. Morse*, 265 Or. 72, 508 P.2d 194, 196 (1973) (stating purpose of California's suspension statute is to pressure corporations to pay tax). If a suspended corporation could conduct business as usual, suspension would provide no more incentive for a corporation to remedy the situation than would delinquency. A corporation would not have to meet a delinquent obligation until dissolution threatened.

We conclude that corporate suspension under UBCA section 16–10–88.2 resulted in suspension of a corporation's authority to conduct business as usual. A corporation suspended under this statute could engage only in activities necessary to wind up its affairs or to remedy its suspension. UBCA section 16–10–139 applies to a suspended corporation; anyone acting on the corporation's behalf who exceeds the corporation's remaining authority is jointly and severally liable for debts and liabilities incurred as a result.

---

**16.** This is especially likely because UBCA § 16–10–88.2 references § 59–7–155, indicating that the legislature was aware of the definition in the tax law when it enacted the UBCA section.

**17.** "The considerations ... as to why a dissolved corporation, whose life has ... been terminated, should be able to protect its assets [through defending or maintaining a law suit,] would seem to apply for even stronger reasons to a corporation which has merely been 'suspended.' " *Mackay & Knobel Enters.*, 460 P.2d at 829.

**18.** Conceivably, a suspended corporation may need to hire an accountant to help prepare a late annual report or seek a loan to pay overdue taxes.

## CONCLUSION

■ Todd and Jeff Crosland exceeded their suspended corporation's authority in negotiating and executing guarantee agreements for CI. Thus, they are jointly and severally liable for the default judgment entered against CI because the judgment represents corporate liability arising from the Crosland's unauthorized actions. We affirm the trial court's grant of summary judgment against Jeff Crosland and reverse the grant of summary judgment in favor of Todd Crosland.

BILLINGS and GREENWOOD, JJ., concur.