Gary J. XANTHOS, Plaintiff
and Respondent,

v.

BOARD OF ADJUSTMENT OF SALT
LAKE CITY, Defendant and
Appellant.

No. 18333.

Supreme Court of Utah.

May 1, 1984.

Richard Rappaport, Salt Lake City, for defendant and appellant.

Roger F. Cutler, Salt Lake City Atty., Judy F. Lever, Asst. Salt Lake City Atty., Salt Lake City, for plaintiff and respondent.

HALL, Chief Justice.

This is an appeal from a judgment of the district court that reversed a denial of a zoning variance by the Salt Lake City Board of Adjustment. We reverse.

In December, 1978, plaintiff Gary Xanthos received notice from the Department of Building and Housing Services that certain of his premises located in Salt Lake City were not in compliance with city zoning ordinances. The notice ordered him to correct the deficiencies. Xanthos responded by applying to the Salt Lake City Board of Adjustment for a variance to allow a nonconforming use of the property.

The lot in question had a newly constructed duplex and a single-family dwelling in the rear of the duplex. Building the duplex caused the dwelling to not have frontage on a dedicated public street, to not have the required side and rear yards and to not have the required off-street parking for a residential R–2 district.

Following a hearing, the Board unanimously denied the requested variance. Xanthos then appealed to the district court for judicial review of the Board's decision under the terms of U.C.A., 1953, § 10–9–15, which states: "The city or any person aggrieved by any decision of the board of adjustment may have and maintain a plenary action for relief therefrom in any court of competent jurisdiction." After a trial to the bench at which the judge heard evidence in addition to that adduced at the Board hearing and considered all of the evidence de novo, the court reversed the Board of Adjustment's decision and ordered the Board to grant the variance.

Xanthos urges that we adopt the reasoning of the judge below, who held that: "Plenary action relief constitutes a complete review of the board of adjustment's decision by trial de novo and the court has the same power as the board of adjustment to review the facts."

The city appeals that ruling, contending that the trial court erred by reviewing an appeal from a Board of Adjustment decision as a trial de novo. The city argues that the court was limited to consideration of whether the Board's action was arbitrary and capricious and not supported by substantial evidence.

This Court has not previously had occasion to interpret the language "plenary action for relief."

In *Denver & Rio Grande Western Railroad Co. v. Public Service Commission*,[1] the statute there interpreted provided that any person aggrieved by a decision of the Commission with regard to a contract motor carrier's license could bring an action for plenary review, which action "shall proceed as a trial de novo." The Court held that "plenary review" meant a full review of the record made before the lower tribunal without the submission of new testimony. The purpose of the de novo requirement was to increase the scope of the review to include questions of fact, as well as of law.

In the statute before us there is no requirement for a trial de novo, and the structure and language of the Act do not contemplate such a de novo review. The statutory language "plenary action *for relief therefrom* " presupposes the continued existence of the administrative action, thus suggesting an appeal rather than a trial de novo. However, the Act also does not lend itself to a review that extends no further than the examination of the record made below.

■ There is no requirement that a formal transcript be made of the proceedings before the Board of Adjustment. The formal record consists of the minutes of the hearing and the formal findings and order. While the proceedings before the Board are taped and the tapes retained for 90 days,

there is no requirement that they be transcribed, and in fact they were not in this case. Therefore, as we said in *Denver & Rio Grande Western Railroad Co. v. Central Weber Sewer Improvement District:*[2] "The nature and extent of the review depends on what happened below as reflected by a true record of the proceedings, viewed in the light of accepted due process requirements."[3] The Court went on to say that if the hearing had proceeded in accordance with due process requirements, the reviewing court could look only to the record, but where it had not or where there was nothing to review, the reviewing court must be allowed to get at the facts.

This analysis serves as well in the case before us. Since there is no record of the proceedings, due process would be denied if the district court could not get at the facts. Therefore, the court must be allowed to take its own evidence and need not necessarily be limited to the evidence presented before the Board of Adjustment. This does not mean that the hearing in the district court should be a retrial on the merits, or that the district court can substitute its judgment for that of the Board.

> This Court has consistently held that: Due to the complexity of factors involved in the matter of zoning, as in other fields where courts review the actions of administrative bodies, it should be assumed that those charged with that responsibility [the Board] have specialized knowledge in that field. Accordingly, they should be allowed a comparatively wide latitude of discretion; and their actions endowed with a presumption of correctness and validity which the courts should not interfere with unless it is shown that there is no reasonable basis to justify the action taken.[4]

(Citations omitted.)

■ Therefore, it follows that the role of the district court in reviewing the Board

---

1. 98 Utah 431, 100 P.2d 552 (1940).

2. 4 Utah 2d 105, 287 P.2d 884 (1955).

3. *Id.* at 887. *See also Peatross v. Board of Comm'rs,* Utah, 555 P.2d 281 (1976).

4. *Cottonwood Heights Citizen Ass'n v. Board of Comm'rs,* Utah, 593 P.2d 138, 140 (1979).

of Adjustment's decision is to determine whether the action taken was so unreasonable as to be arbitrary and capricious.[5] In order to make that determination, the district court may take additional evidence, but it must be relevant to the issues that were raised and considered by the Board.

The next question that must be considered, based on this standard of review, is whether the Board of Adjustment's decision not to grant the requested variance was so unreasonable as to be arbitrary and capricious.

In the case at hand, the district judge undertook to weigh anew the underlying factual considerations. While there may have been some evidence in the record to support the trial judge's findings, it was not his prerogative to weigh the evidence anew. His role was limited to determining whether there was evidence in the record to support the Board of Adjustment's action. The judge went beyond this role and decided the case according to his notion of what was in the best interests of the citizens of Salt Lake City. The findings of fact and conclusions of law entered by the trial judge reflect that his disagreement with the decision of the Board of Adjustment centered on the perceived economic impact on Xanthos (loss of $150 per month rent) and the loss of one low-cost rental unit in the city. The judge made it clear that he thought retention of low-cost housing, regardless of zoning considerations, should be the overriding policy in Salt Lake City. However, it does not matter whether the judge agrees or disagrees with the rationale of the Board or the policy grounds upon which a decision is based. It does not lie within the prerogative of the trial court to substitute its judgment for that of the Board where the record discloses a reasonable basis for the Board's decision.[6]

The record in this case clearly reflects that the Board of Adjustment's action was not arbitrary or capricious and that there was a reasonable basis in the evidence to justify it.

Utah Code Annotated, 1953, § 10-9-12 states:

> The board of adjustment shall have the following powers:
>
> . . . .
>
> (3) To authorize upon appeal such variance from the terms of the ordinance as will not be contrary to the public interest, where owing to special conditions a literal enforcement of the provisions of the ordinance will result in unnecessary hardship; provided, that the spirit of the ordinance shall be observed and substantial justice done. Before any variance may be authorized, however, it shall be shown that:
>
> (a) The variance will not substantially affect the comprehensive plan of zoning in the city and that adherence to the strict letter of the ordinance will cause difficulties and hardships, the imposition of which upon the petitioner is unnecessary in order to carry out the general purpose of the plan.
>
> (b) Special circumstances attached to the property covered by the application which do not generally apply to the other property in the same district.
>
> (c) That because of said special circumstances, property covered by application is deprived of privileges possessed by other properties in the same district; and that the granting of the variance is essential to the enjoyment of a substantial property right possessed by other property in the same district.

Therefore, in order to justify a variance, the statute requires that the applicant show at a minimum that the variance

---

**5.** *See also Honn v. City of Coon Rapids,* Minn., 313 N.W.2d 409 (1981); *Williams v. Zoning Adjustment Bd.,* Wyo., 383 P.2d 730 (1963); *Rickard v. Fundenberger,* 1 Kan.App.2d 222, 563 P.2d 1069 (1977); *Demarest v. Mayor & Council of Hillsdale,* 158 N.J.Super. 507, 386 A.2d 875 (1978).

**6.** *Naylor v. Salt Lake City Corp.,* 17 Utah 2d 300, 410 P.2d 764 (1966). *See also Levy v. Board of Adjustment,* 149 Colo. 493, 369 P.2d 991 (1962).

would not substantially affect the comprehensive zoning plan; that there are special conditions with regard to the property; that unnecessary hardship would result if the variance was not granted; and that substantial property rights enjoyed by other property in the area would be denied.

■ It is not enough to show that the property for which the variance is requested is different in some way from the property surrounding it. Each piece of property is unique. What must be shown by the applicant for the variance is that the property, itself contains some special circumstance that relates to the hardship complained of and that granting a variance to take this into account would not substantially affect the zoning plan. Respondent has failed to meet this burden.

■ The evidence adduced does not support respondent's claim of special circumstance. The property is neither unusual topographically or by shape, nor is there anything extraordinary about the piece of property itself.[7] Simply having an old building on land upon which a new building has been constructed does not constitute special circumstances. Both Albert Blair, Director of the Department of Building and Housing Services for Salt Lake City, and Mark Hafey, Director of Current Planning in the Salt Lake City Planning and Zoning Department, testified that, although the dwelling itself prior to the construction of the duplexes was a nonconforming use[8] and was therefore entitled to be maintained as it was absent new construction, city ordinances and policy did not allow the structure to be made illegal or more nonconforming by additional construction. Further, the record is replete with indications that the city was not made aware at any time during the application approval and inspection process that the structure on the lot, prior to building the duplexes, was a dwelling. The application, plot plan and building plans for the duplexes submitted to the city and relied on in granting

the requisite building permit affirmatively stated that the land was vacant and without a dwelling on it. Both Blair and Hafey testified that the city relies on statements made in applications during the initial review process in both the zoning and building departments. In this case, had the application noted a dwelling on the lot, no permit would have been granted to construct the duplexes as initially proposed. Also, testimony indicated that, during inspections after building commenced, city inspectors had no reason to believe that the structure on the property was a dwelling. All indications were that the structure was little more than a shack and that there was no evidence of habitation. This evidence was bolstered by the testimony of Gary Xanthos. He testified that he had been living in the structure and had moved out in July, 1975. He further testified that the dwelling was vacant thereafter for from two to six months. Testimony by Mark Peguillan, a Salt Lake building inspector, indicated that the final inspections were done on the duplexes on September 30, 1975. Thus, according to Xanthos' testimony, the dwelling was empty at the time of the inspections. Further, Peguillan testified that he had noticed the old building in the corner and had asked the chief building inspector about it. The chief inspector told Peguillan that the old building was going to be torn down. Finally, there was evidence that the structure was never listed as an independent residence in city records, did not have an assigned address and did not have authorized water, sewer or electrical service. For example, Hafey testified that the city building inspection department had only authorized eight meters to the Xanthos property, one for each unit in the duplex. However, upon visiting the property after notice of the zoning violation, Hafey found a brand new, unauthorized ninth box on the rear structure.

Xanthos claims that requiring him to now tear down the structure or to return it

---

7. *See* Anderson, American Law of Zoning § 18.-34 (2d ed. 1977).

8. Testimony indicated that the structure was built prior to 1927, when the zoning ordinances were passed.

to use as a storage building, thus resulting in loss of rental, is an unnecessary hardship that requires a variance. This argument has no merit.

■■■ Hardship is not demonstrated by economic loss alone.[9] It must be tied to the special circumstances, none of which have been proven here. Every person requesting a variance can indicate some economic loss. To allow a variance anytime any economic loss is alleged would make a mockery of the zoning program. Further, the Xanthos' brought their losses upon themselves. The application affirmatively alleged to the city that no dwelling existed on the land upon which he proposed to build duplexes, and the city relied on those allegations.

■■■ Xanthos contends that he should not be held responsible for the contents of the application for the building permit since it was not signed by the applicant, Xanthos' father, Mr. Xanthos, but by Stan Conrad, apparently a subcontractor. This contention is without merit. First of all, the fact that the application was not signed by Mr. Xanthos is irrelevant. Xanthos does not contend that Mr. Xanthos was unaware of the contents of the application or disavowed them. Nor does he argue that the application submitted was not intended to function as the application for a building permit. Further, there is no testimony to that effect. Therefore, it is only reasonable to conclude that Conrad was the agent of Mr. Xanthos when he filled out and submitted the application. Mr. Xanthos is consequently charged with knowledge of the contents of the application.

Xanthos also contends the city should be estopped from enforcing the zoning ordinances because the plot plan showed an existing structure. Thus, he argues that the city had notice there was a structure on the property, and by failing to discover that it was a dwelling the city had misled Mr. Xanthos to his detriment.

■■■ This Court has recognized there are circumstances where it is inequitable to enforce a zoning ordinance.[10] As we said in *Utah County v. Young:* [11]

> To invoke the doctrine [of equitable estoppel] the county must have committed an act or omission upon which the developer could rely *in good faith* in making substantial changes in position or incurring extensive expenses. The action upon which the developer claims reliance must be of a clear, definite and affirmative nature. If the claim be based on an omission of the local zoning authority, omission means a negligent or culpable omission where the party failing to act was under a duty to do so. Silence or inaction will not operate to work an estoppel. Finally, and perhaps most importantly, the landowner has a duty to inquire and confer with the local zoning authority regarding the uses of the property that would be permitted.[12] [Citations omitted.] [Emphasis added.]

Further, as stated in *Salt Lake County v. Kartchner:* [13]

> Estoppel, waiver or laches ordinarily do not constitute a defense to a suit for injunctive relief against alleged violations of the zoning laws, unless the circumstances are exceptional. Zoning ordinances are governmental acts which rest upon the police power, and as to violations thereof any inducements, reliances, negligence of enforcement, or like factors are merely aggravations of the violation rather than excuses or justification therefore.[14]

9. *See, e.g., Walton v. Tracy Loan & Trust Co.,* 97 Utah 249, 92 P.2d 724 (1939); *Stice v. Gribben-Allen Motors, Inc.,* 216 Kan. 744, 534 P.2d 1267 (1975).

10. *Salt Lake County v. Kartchner,* Utah, 552 P.2d 136 (1976); *Wood v. North Salt Lake,* 15 Utah 2d 245, 390 P.2d 858 (1964).

11. Utah, 615 P.2d 1265 (1980).

12. *Id.* at 1267–68.

13. *Supra,* n. 10.

14. *Supra,* n. 10 at 138 (quoting 8A McQuillan, Municipal Corporations (1965, Rev.Vol.), § 25.-349, pp. 491–2). *See also Utah County v. Baxter,* Utah, 635 P.2d 61, 65 (1981).

Finally, estoppel may not be used as a defense by a person who has acted in bad faith, fraudulently or with knowledge.[15]

▬ In light of these standards, Xanthos' argument has little merit. First of all, to hold that the city should have been put on notice that a dwelling existed on the land because an existing structure was noted on the plot plan, in the face of an affirmative statement that no such dwelling existed, would put a premium on prevarication, encourage equivocation and impermissibly shift the burden of proof in variance cases to the city. None of these results is acceptable.

Secondly, the zoning regulations did not prohibit a structure located as the one at issue was as long as the structure was used for storage or garage purposes. Since testimony indicated that the structure appeared to be a garage or storage shed, and the application stated that no dwelling was on the property, the inspectors were in no way negligent in failing to find out that the structure was used as a dwelling. In addition, there was testimony that a building inspector on site had inquired about the old structure on the corner of the lot and had been told it was to be torn down.

Finally, there was evidence from a neighbor that Mr. Xanthos improved the structure to look habitable[16] only after the duplexes were built and the final inspections were done. The neighbor also testified that Mr. Xanthos made the improvements after telling her he knew he was doing so illegally.

Based on the foregoing, the essential elements of equitable estoppel are missing, and Xanthos has not shown any other exceptional circumstances sufficient to constitute a defense to enforcement of the zoning ordinance. Therefore, based upon substantial evidence, the Board of Adjustment reasonably concluded that the granting of the requested variance would be inimical to the best interest of the district and contrary to the spirit and intent of the zoning ordinance. We reverse the decision of the district court and reinstate the order of the Board of Adjustment.

STEWART, DURHAM and OAKS, JJ., concurs in the result.

HOWE, Justice (dissenting).

I dissent. The majority opinion misperceives some of the facts and fails to give proper deference to certain findings of fact made by the district court and the Board of Adjustment, contrary to our rules of appellate review. In so doing, the majority opinion erroneously destroys one of the bases for the district court's judgment.

The district court found that the building in question had been erected prior to 1927, the year of enactment of the Salt Lake City zoning ordinance. The city conceded that the building was a nonconforming use, not affected by the passage of the zoning ordinance. The court further found that since at least April 21, 1942, it had been occupied and used as a dwelling by a large number of tenants. Other significant findings of fact, which the majority opinion either does not mention or dismisses as unimportant, are:

17. City building inspectors went to the site at least five times during the course of construction. The structure was observable to the inspectors, and one of the city inspectors, Marvin Peguillan, observed the building and inquired about it but none of the inspectors followed through with removing the building from use or availability for use as a dwelling.

18. The City issued certificates of occupancy for the four duplexes. There was no evidence or record of any communicated conditions or stipulations restricting or concerning the use or removal of the structure as a single family dwelling.

19. Although the application made no reference to the single family dwelling,

---

15. *Young, supra,* n. 11 at 1267.

16. Mr. Xanthos put on new siding, added a porch and made various other improvements thus making the structure look more like a little house.

the inclusion of the building on the plot plan was sufficient disclosure by the applicant to place the City on reasonable notice to make further inquiry about the existence and use of the building.

It is stated in the majority opinion that "the application, plot plan and building plans for the duplexes submitted to the city and relied on in granting the requisite building permit affirmatively stated that the land was vacant and without a dwelling on it." That statement is inaccurate in many particulars:

(1) The application for the building permit was signed by one Stan R. Conrad, who was neither the contractor nor the owner. One witness surmised that he may have been a subcontractor. No evidence was presented that he in any way had authority to make statements or representations on behalf of the owner. It is not reasonable to conclude agency under the facts of this case, as the majority asserts. The application contained a space for "Previous Use of Land or Structure." The word "vacant" was filled in. Another question asked for the number of dwelling units then on the lot. The answer given was "none." These two questions are ambiguous since they do not define what is the "land" or the "lot." If they mean the land or lot on which the duplexes were to be built, it was true that they were vacant, since no other structures or buildings had to be torn down to accommodate them.

(2) At any rate, any error on the part of Conrad in answering those questions was rendered harmless by the accompanying plot plan which showed an existing building on the plot. It did not show that it was vacant as the majority opinion erroneously states. This one fact alone put the city on notice of the existence of the old building, and the district court so found in Finding # 19.

(3) The building plans filed by the owner with the city could not be found by the city at the time of the district court hearing. Finding # 16. They were not in evidence. Thus there was no evidence that the plans showed the land to be vacant. The majority opinion again errs in stating that the plans showed the land to be vacant. The Board of Adjustment had the plans before it and found that they did show an existing building on the lot.

As appears in Finding # 17 quoted above, city building inspectors went to the site at least five times during the course of construction. A witness from the city testified that usually there are ten inspections during construction by at least four different inspectors. One inspector mentioned the existence of the building to his supervisor, but the latter did not see fit to inquire about it. It is immaterial that they may have *assumed* it was vacant. The majority opinion states that "no one was living in it at the time." There was no evidence to that effect, and neither the Board of Adjustment nor the district court so found, but found it had been occupied and used by tenants since 1942. The closest neighbor, Nora Cottle, testified before the Board of Adjustment, and the Board found that the building was occupied by tenants when the duplexes were built. She also testified that it had always been lived in and had never been used as a garage or storage shed. One of the owners, Gary Xanthos, testified that he resided in the old house from March to July, 1975, and the duplexes were then completed. The majority mentions that the house was vacant for two to six months after Xanthos moved out in July, but by then the duplexes had been completed, although the city did not make its final inspection until September 30. Thus it is clear that when the first four inspections were made, the house was not vacant. No one from the city testified that it was vacant—only that they assumed it was vacant. It is highly significant that the Board of Adjustment, although refusing to grant the plaintiff a variance, found, as did the district judge, that "the building inspector should have noted the problem when inspecting the property." To hold, as does the majority opinion, that the city could rely exclusively upon the plaintiff's statements in his application for a building permit as to the condition of the property and

completely ignore what it saw during the five inspections, is wholly unwarranted in view of the district court's Findings #17 and #19, which found to the contrary. Furthermore, it was uncontroverted that the city furnished and collected monthly charges for water and sewer service to the old building. The city had also approved the furnishing of electrical service to the building by an electric utility. When the duplexes were completed, a certificate of occupancy was given by the city without condition or restriction. For three years thereafter the city registered no complaint against the building.

Based on those facts, the district judge concluded that the plaintiff was entitled to a variance to maintain the structure under U.C.A., 1953, § 10–9–12(3) because there were special circumstances attached to the property which did not generally apply to other properties in the same district, including but not limited to: (a) age and occupancy of the dwelling; (b) the approval by the city of the development of the duplexes, and the issuances of certificates of occupancy for them; and (c) the failure of the city to inform James Xanthos that the dwelling would not comply with the zoning ordinances, thereby denying him the opportunity to redesign the layout for the duplexes in such a way as to not require the demolition of the dwelling.

The majority opinion urges that we accord proper deference to the findings and conclusions of the Board of Adjustment, but fails to do that very thing. The majority completely ignores one of the Board's findings of fact (which was also made by the district court) that the "building inspectors should have noted the problem." Thus, unquestionably the city is charged with knowledge of what an inspection of the old building would have revealed. Zoning ordinances contain many technical requirements not generally known to the public, including the minimum size of front, side and rear yards. People properly rely on a city's representation when a building permit is issued and when inspections are made during construction that the structure when completed will not be in violation of the zoning ordinance. Certainly, in a case such as the instant case, where a plot plan and building plans showing an existing building, are presented to the city and then later, five times, its inspectors are on the premises, it is not expecting too much to require that the city then and there raise any objection it may have to any violation of its own zoning or building ordinances. The majority fails to recognize these facts. It erroneously and exclusively relies upon an ambiguous application not made out or signed by the owner. Furthermore, Albert Blair, Director of the Department of Building and Housing Services for the city, testified before the Board of Adjustment that the building inspector "usually does not look at the permit; he refers to the plot plan." The plot plan clearly showed the existing building that the inspectors noted when they made their five visits to the property. The trial court properly found that the failure of the city to inform the plaintiff's father that the old dwelling would not comply with zoning ordinances robbed him of the opportunity to redesign the layout so as to conform.

This Court has in at least two cases recognized that there are circumstances where it would be inequitable to enforce a zoning ordinance. *Salt Lake County v. Kartchner*, Utah, 552 P.2d 136 (1976); *Wood v. North Salt Lake*, 15 Utah 2d 245, 390 P.2d 858 (1964). See also *Utah County v. Baxter*, Utah, 635 P.2d 61 (1981). More closely in point are cases from other jurisdictions where under facts similar to the instant case the enforcement of a zoning ordinance was refused by courts when the municipal authority had acted or failed to act to the detriment of a property owner who relied upon such authority. For example, in *City Service Oil Company v. City of Des Plaines*, 21 Ill.2d 157, 171 N.E.2d 605 (1961), a city was estopped from preventing erection of a service station in violation of its zoning ordinance when the property owner had expended large sums for the installation of pumps and tanks in reliance upon a building permit that had been erroneously issued, and in which city

officials had acquiesced for several months. The Supreme Court of Illinois held that where the owner's actions are induced by the conduct of municipal officers, and where in the absence of an estoppel, he would suffer a substantial loss and the "municipality would be permitted to stultify itself by retracting what its agents had done," an estoppel would be raised by the court. See also the later Illinois case of *City of Evanston v. Robbins*, 117 Ill. App.2d 278, 254 N.E.2d 536 (1969), holding that in zoning cases the doctrine of estoppel may be applied where the record suggests that the detriment to the public is negligible and there is no risk to public health or safety.

Other cases invoking estoppel where building permits had been issued and construction had been commenced or completed include *Tankersley Brothers Industries, Inc. v. City of Fayetteville*, 227 Ark. 130, 296 S.W.2d 412 (1956); *Strong v. County of Santa Cruz*, 15 Cal.3d 720, 125 Cal.Rptr. 896, 543 P.2d 264 (1975); *Township of Haverford v. Spica*, 16 Pa.Cmwlth. 326, 328 A.2d 878 (1974). In the latter case, the court quoted with approval at 882 the following from *In re Heidorn*, 412 Pa. 570, 195 A.2d 349 (1963):

> While courts are reluctant, and should be, to impose the sanction of laches on governmental divisions, equity cannot close its eyes to the sloth, indifference or official neglect of a municipal body anymore than it can to the neglect of an individual where such neglect harms an innocent person.

I would affirm the judgment of the trial court. The undisputed evidence and the findings of fact made by the Board of Adjustment and the trial court require the imposition of an estoppel against the city in enforcing its ordinance against this property owner. The misleading acts and inaction of the city, together with the reliance thereon by the owner, are clear. There was no prevarication or equivocation here by the owner as the majority suggests. The city does not contend that any problem of public health or safety will be encoun-

tered if a variance is granted. I am in full accord with the statement made by the court in *New-Mark Builders, Inc. v. City of Aurora*, 90 Ill.App.2d 98, 233 N.E.2d 44 (1967), cited in *City of Evanston v. Robbins*, supra, that "[m]unicipal corporations, as well as private corporations and individuals, are bound by the principles of fair dealing."