Larry PATTERSON, Plaintiff
and Appellee,

v.

UTAH COUNTY BOARD OF ADJUST-
MENT, Glenn B. Smith, Marianne M.
Smith, W. Greg Buttars, and Leslie E.
Buttars, Defendants and Appellants.

No. 940014–CA.

Court of Appeals of Utah.

March 29, 1995.

Gary H. Weight, Provo, for appellants.

George E. Brown, Jr., and Karen M. Pat-
terson, American Fork, for appellee.

Before GARFF[1], ORME, and WILKINS, JJ.

WILKINS, Judge:

Glenn and Marianne Smith and Greg and Leslie Buttars appeal from a decision of the district court finding that the Utah County Board of Adjustment (the Board) acted arbitrarily, capriciously, and illegally in approving the appellants' application for a special exception under the county's zoning ordinance. We reverse the district court's decision.

## BACKGROUND

In February 1991, the Smiths and the Buttars filed an appeal with the Board, requesting a special exception to build and operate a private airstrip in Cedar Valley, Utah County. The two couples were purchasing approximately 180 acres in Cedar Valley where they proposed to build two residences and the airstrip. Mr. Smith is a pilot, and the couples planned to use the airstrip for their private use.

On March 5, 1991, the Board held a public hearing to discuss and decide the matter. Actual notice of the hearing, dated February 21, had been sent to five adjoining property owners. After reviewing the application for the special exception, the report from the zoning administrator's staff, and other documents, and after receiving testimony from Buck Rose, the County Planner, as well as from Mr. and Mrs. Smith, and Mr. Buttars, the Board approved the request for a special exception.

Larry Patterson owns and operates the Cedar Valley Airport, a private airport used for commercial purposes and located within a few miles of the proposed airstrip. Mr. Patterson, who was not present at the hearing, objected to the Board approving the airstrip so close to his airport and filed a complaint in the district court on April 3, 1991.

On April 22, 1993, the district court, acting pursuant to jurisdiction conferred under Utah Code Ann. § 17–27–708 (1991), filed a Memorandum Decision, finding the Board's decision to be arbitrary, capricious, and illegal. The Smiths and the Buttars appeal from the district court's decision.

## SCOPE OF REVIEW

Since the district court's review of the Board's decision was limited to a review of the Board's record, we do not accord any particular deference to the district court's decision.[2] Instead, we review the Board's decision as if the appeal had come directly from the agency.[3] Thus, the standard for our review of the Board's decision is the same standard established in the Utah Code for the district court's review.

Section 17–27–708 of the Utah Code provides that "[a]ny person adversely affected by any decision of a board of adjustment may petition the district court for a review of the decision." Utah Code Ann. § 17–27–708(1) (1991). However, "[i]n the petition, the plaintiff may only allege that the board of adjustment's decision was arbitrary, capricious, or illegal." *Id.* § 17–27–708(2).

Thus, the Board's actions are accorded substantial deference and will be rejected on appeal only if they are so unreasonable as to be arbitrary and capricious or if they violate the law. The reason for this lies in the substantial discretion granted boards of adjustment. The boards have been established "[i]n order to provide for just and fair treatment in the administration of local zoning ordinances, and to ensure that substantial justice is done." *Id.* § 17–27–701 (Supp. 1994). More specifically, and when authorized to do so, "[t]he board of adjustment

---

1. Senior Judge Regnal W. Garff, acting pursuant to appointment under Rule 3–108(4), Utah Code of Judicial Administration.

2. *See Vali Convalescent & Care Inst. v. Division of Health Care Fin.,* 797 P.2d 438, 443 (Utah App. 1990) (stating no deference given to trial court's review of administrative agency decision when that review is limited to administrative record);

*see also Kline v. Utah Dep't of Health,* 776 P.2d 57, 60 (Utah App.1989) ("We accord no presumption of correctness to the [district court's judgment] since its review of the administrative record is not more advantaged than our own.").

3. *See Vali,* 797 P.2d at 443; *Kline,* 776 P.2d at 60.

may hear and decide special exceptions ... based ... on the standards contained in the zoning ordinance." *Id.* § 17–27–706(2) (1991). "Within the boundaries established by such standards, however, the [board] is afforded broad latitude of discretion, and its decisions are afforded a strong presumption of validity." *Thurston v. Cache County,* 626 P.2d 440, 445 (Utah 1981).[4]

Accordingly, we will not substitute our judgment on matters of public policy normally left to the Board's discretion;[5] we will simply ensure that the Board proceeds within the limits of fairness and justice and acts in good faith to achieve permissible ends.

The Board will be found to have exercised its discretion within the proper boundaries unless its decision is arbitrary, capricious, or illegal. Further, "[t]he court shall affirm the decision of the board ... if the decision is supported by substantial evidence in the record." Utah Code Ann. § 17–27–708(6) (1991). Together, these concepts mean that the Board's decision can only be considered arbitrary or capricious if *not* supported by substantial evidence.[6]

In determining whether substantial evidence supports the Board's decision we will consider all the evidence in the record, both favorable and contrary to the Board's decision. *See First Nat'l Bank of Boston v.*

*County Board of Equalization of Salt Lake County,* 799 P.2d 1163, 1165 (Utah 1990); *Grace Drilling Co. v. Board of Review,* 776 P.2d 63, 68 (Utah App.1989). Nevertheless, our review, like the district court's review, "is limited to the record provided by the board of adjustment.... The court may not accept or consider any evidence outside the board['s] record...." Utah Code Ann. § 17–27–708(5)(a) (1991). We must simply determine, in light of the evidence before the Board, whether a reasonable mind could reach the same conclusion as the Board. It is not our prerogative to weigh the evidence anew. *See Xanthos,* 685 P.2d at 1035.[7]

On the other hand, whether or not the Board's decision is illegal depends on a proper interpretation and application of the law. These are matters for our determination, and we accord no deference to the district court or the Board.

## CHALLENGED FINDINGS AND ALLEGED ILLEGALITY

Mr. Patterson has alleged that the Board's decision to allow construction and operation of the proposed airstrip is arbitrary, capricious, and illegal. As a basis for his petition, Mr. Patterson challenges several required findings of the Board as being arbitrary and

---

4. Indeed, Utah courts have repeatedly indicated that they will "afford a comparatively wide latitude of discretion to administrative bodies charged with the responsibility of zoning, as well as endowing their actions with a presumption of correctness and validity, because of the complexity of factors involved in the matter of zoning and the specialized knowledge of the administrative body." *Sandy City v. Salt Lake County,* 794 P.2d 482, 485–86 (Utah App.1990), *rev'd in part on other grounds,* 827 P.2d 212 (Utah 1992); *accord Xanthos v. Board of Adjustment of Salt Lake City,* 685 P.2d 1032, 1034 (Utah 1984); *Cottonwood Heights Citizens Ass'n v. Board of Comm'rs of Salt Lake County, et al.,* 593 P.2d 138, 140 (Utah 1979).

5. "[I]t does not matter whether the [court] agrees or disagrees with the rationale of the Board or the policy grounds upon which a decision is based. It does not lie within the prerogative of the ... court to substitute its judgment for that of the Board...." *Xanthos,* 685 P.2d at 1035. Thus, courts will not consider the wisdom, necessity, or advisability of the Board's zoning determination. *See Sandy City,* 794 P.2d at 486.

6. " 'Substantial evidence' is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *First Nat'l Bank of Boston v. County Bd. of Equalization of Salt Lake County,* 799 P.2d 1163, 1165 (Utah 1990). It is "more than a mere 'scintilla' of evidence ... though 'something less than the weight of the evidence.' " *Grace Drilling Co. v. Board of Review,* 776 P.2d 63, 68 (Utah App.1989) (quoting *Idaho State Ins. Fund v. Hunnicutt,* 110 Idaho 257, 715 P.2d 927, 930 (1985)).

7. It is incumbent upon the party challenging the Board's findings or decision to marshal all of the evidence in support thereof and show that despite the supporting facts, and in light of conflicting or contradictory evidence, the findings and decision are not supported by substantial evidence. *See First Nat'l,* 799 P.2d at 1165; *Grace Drilling,* 776 P.2d at 68; *see also Heinecke v. Department of Commerce,* 810 P.2d 459, 464 (Utah App.1991) (regarding how marshaling works in this context).

capricious. Indeed, for the Board's overall decision to be supported by substantial evidence, each required finding must be supported by substantial evidence. In the present case, § 7–21–C of the county's zoning ordinance requires that:

> The following standards shall be met as a prerequisite to approving any special exception.
>
> 1. It shall promote the public health, safety, and welfare.
>
> 2. It shall conform to the "characteristics and purposes" stated for the zoning district involved and the adopted county master plan.
>
> 3. It shall be compatible with the public interest and with the characteristics of the surrounding area.
>
> 4. It shall not adversely affect local property values.

Utah County Zoning Ordinance § 7–21–C.[8] Although an applicant must meet other standards and requirements before the Board can approve a special exception, Mr. Patterson only specifically challenges the Board's findings regarding these four standards.

However, Mr. Patterson has failed to adequately marshal the evidence in the record supporting each finding, merely supplying the court with selected supporting facts and attempting to rebut those facts with evidence not in the record nor before the Board.[9] Accordingly, we will not address Mr. Patterson's claims with respect to the last three required standards mentioned. However, we will address Mr. Patterson's claim regarding the first required standard, that the proposed special exception must "promote the public health, safety, and welfare." We reach this issue because, despite the lack of marshaling, Mr. Patterson alleges that the conditions created by the Board's decision result in an "inherently unsafe condition" which essentially makes impossible, as a matter of law, any finding that this first standard could be met.

In addition, Mr. Patterson also charges that construction and operation of the airstrip as approved expressly violates § 3–34 of the Utah County Zoning Ordinance, making the Board's decision illegal. We address the challenged finding first and then the charge of illegality.

## I. Alleged Arbitrariness of the Board's Finding

■ Section 7–21–C(1) of the Utah County Zoning Ordinance requires as a condition to a proposed special exception's approval that it "promote the public health, safety and welfare." Mr. Patterson challenges the Board's finding that this standard is met by substantial evidence. Indeed, the district court concluded that the Board "acted arbitrarily in finding that the proposed airstrip would promote public health, safety, and welfare." We will only address this claim to the extent that Mr. Patterson has asserted throughout the proceedings, and the district court agreed, that the location of the proposed airstrip so close to the Cedar Valley Airport presents an "inherently unsafe situation."

We must first understand what the ordinance requires. In other words, we must determine what it means to "promote public health, safety, and welfare" before we can determine whether substantial evidence in the record supports the Board's finding. The word "promote" means "[t]o contribute to growth, enlargement, or prosperity of; to forward; to further; to encourage; to advance." Black's Law Dictionary 1214 (6th ed. 1990). From this list of acceptable definitions, we can see that "promote" implies varying degrees of proactivity. When the phrase is read as a whole, promoting the public health, safety, and welfare can reasonably be understood to encompass a spectrum from "aggressively advancing or furthering the levels of public health, public safety, and public welfare" to simply "making beneficial use of property while encouraging safe design and use."

---

8. All citations to the Utah County Zoning Ordinance refer to the ordinance as it was in effect at the time the application was made and the hearing held.

9. *See supra* note 7 (addressing marshaling requirement of party challenging Board's decision).

In this case, we cannot rely on the plain language of the ordinance to guide our interpretation. "A statute is ambiguous if it can be understood by reasonably well-informed persons to have different meanings." *Miller Welding Supply, Inc. v. Utah State Tax Comm'n*, 860 P.2d 361, 362 (Utah App.1993) (quoting *Sneddon v. Graham*, 821 P.2d 1185, 1187 (Utah App.1991)), *cert. denied*, 870 P.2d 957 (Utah 1994). Thus,

> where there is an ambiguity or uncertainty in a portion of a statute, it is proper to look to an entire act in order to discern its meaning and intent; and if it is reasonably susceptible of different interpretations, the one should be chosen which best harmonizes with its general purpose.

*Murphy v. Crosland*, 886 P.2d 74, 80 (Utah App.1994) (quoting *Grant v. Utah State Land Bd.*, 26 Utah 2d 100, 103, 485 P.2d 1035, 1037 (1971)). Indeed, this court has previously stated that it will "divine the meaning of [a provision in] the county zoning ordinance . . . from the general purpose of the ordinance." *Town of Alta v. Ben Hame Corp.*, 836 P.2d 797, 801 (Utah App.1992).

■ Furthermore, because zoning ordinances are in derogation of a property owner's common-law right to unrestricted use of his or her property, provisions therein restricting property uses should be strictly construed, and provisions permitting property uses should be liberally construed in favor of the property owner. *Sammons v. Village of Batavia*, 53 Ohio App.3d 87, 557 N.E.2d 1246, 1249 (1988); *see* 83 Am.Jur.2d *Zoning & Planning* § 977 (1992).[10]

The phrase, "promote the public health, safety, and welfare," and slight variations thereof, have become almost boiler-plate language used by legislatures and courts to permit or justify various actions. Indeed, the concept of promoting public health, safety, and welfare is most commonly associated with a state's exercise of its police power, "the residuary grant contemplated by the Tenth Amendment" of our federal constitution. *Barnett v. Lindsay*, 319 F.Supp. 610, 611 (D.Utah 1970); *see* U.S. Const. amend. X. Utah courts have long declared that "[i]t is elementary that the governing authority in the exercise of its police power has both the prerogative and the responsibility of enacting laws which will promote and conserve the health, safety, morals and general welfare of society." *West Valley City v. Streeter*, 849 P.2d 613, 614 (Utah App.1993) (quoting *Peck v. Dunn*, 574 P.2d 367, 368 (Utah), *cert. denied*, 436 U.S. 927, 98 S.Ct. 2822, 56 L.Ed.2d 770 (1978)).

■ The Utah Legislature has delegated to counties the authority to enact ordinances, rules, and regulations pursuant to this police power. *See* Utah Code Ann. § 17-5-263 (Supp.1994). Accordingly, all county ordinances enacted through the exercise of police power are considered valid unless they "do not rationally promote the public health, safety, morals and welfare." *State v. Hutchison*, 624 P.2d 1116, 1127 (Utah 1980). Even so, courts have traditionally construed such a requirement broadly. *See id.* at 1125 ("A general welfare or similar clause, granting extremely broad power to a municipal[ity,] is

---

10. *See also Ex parte Fairhope Bd. of Adjustment & Appeals*, 567 So.2d 1353, 1354–55 (Ala.1990) (land use restrictions are strictly construed in favor of landowner); *Thomas v. City of Crescent City*, 503 So.2d 1299, 1301 (Fla.App.1987) (words in zoning regulations should be given broadest meaning, and ordinances interpreted in favor of property owner); *State v. Lum*, 8 Haw. App. 406, 807 P.2d 40, 43 (zoning ordinances are in derogation of common law, and their provisions must be strictly construed), *cert. denied*, 72 Haw. 619, 841 P.2d 1075 (1991); *Town of Merrillville Bd. of Zoning Appeals v. Public Storage, Inc.*, 568 N.E.2d 1092, 1097 (Ind.App.1991) (zoning ordinances are construed in favor of free use of land); *Fremont Township v. McGarvie*, 164 Mich.App. 611, 417 N.W.2d 560, 562 (1987) (language of zoning ordinance must be interpreted in favor of property owner where doubt exists); *Whistler v. Burlington Northern R.R.*, 228 Mont. 150, 741 P.2d 422, 425 (1987) (zoning ordinances are in derogation of common law, and such ordinances should be strictly construed, or at very least, given fair and reasonable interpretation with regard given to proposed use); *Tennessee Manufactured Housing Ass'n v. Metro. Gov't*, 798 S.W.2d 254, 260 (Tenn.App.1990) (zoning ordinances should be construed in favor of property owners' right to free use of their property); *In re Shearer Variance*, 156 Vt. 641, 588 A.2d 1058 (1990) (zoning ordinances must be read strictly, resolving any doubts in favor of landowner).

liberally construed to accord ... wide discretion in the exercise of the police power.").

Furthermore, "[i]t is established that an owner of property holds it subject to zoning ordinances *enacted pursuant to a state's police power." Western Land Equities, Inc. v. City of Logan,* 617 P.2d 388, 390 (Utah 1980) (emphasis added) (citing *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926)). As such, the underlying "purpose of traditional zoning is to protect the public health, safety, and welfare and to minimize conflicts between incompatible uses." *Save Our Rural Environment v. Snohomish County,* 99 Wash.2d 363, 662 P.2d 816, 819 (1983).[11]

The zoning laws accomplish this general purpose "by providing a more stable environment for the orderly development of a community." 83 Am.Jur.2d *Zoning & Planning* § 70 (1992); *accord Naylor v. Salt Lake City Corp.,* 17 Utah 2d 300, 410 P.2d 764, 765 (1966) ("The foundation reason for zoning is to regulate the growth and development of the [community] in an orderly manner."). More specifically, our supreme court has recognized that among the legitimate objectives to be served by zoning

> is to avoid mixing together of industrial, commercial, business and residential uses; the prevention of undue concentrations of people in certain areas under undesirable conditions; making provision for safe and efficient transportation; for recreational needs; and for the enhancement of aesthetic values, all in order to best serve the purpose of *promoting the health, safety, morals and general welfare of the [community] and its inhabitants.*

*Naylor,* 410 P.2d at 765 (emphasis added).[12] Thus, we can conclude that the proper exercise of the zoning power does in fact promote the public health, safety, and welfare.

Furthermore, "the special exception is a valid zoning mechanism that delegates to an administrative board a limited authority to permit enumerated uses which the legislative body has determined can ... properly be allowed in a specified use" zone. *Rockville Fuel & Feed Co., Inc. v. Board of Appeals,* 257 Md. 183, 262 A.2d 499, 502 (1970).[13] Assuming the specific

> standards and requirements enumerated in the ordinance are met in a particular case, the various special exceptions specifically authorized are a part of the comprehensive zoning plan and *therefore* promote the health, safety and general welfare, to the same extent as do the uses permitted as of right in the zone involved.

*Id.* at 503 (emphasis added).

■ Mindful of the general zoning purposes and applicable rules of statutory construction—and mindful of the fact that "promoting the public health, safety, and welfare" is such a common standard—we construe the requirement liberally. Accordingly, we conclude that a proposed special exception will "promote the public health, safety and welfare" if to grant the exception will make good zoning policy, meaning it will contribute to the orderly development of the county as a whole.

From a practical standpoint, this standard necessarily leaves substantial discretion to the Board of Adjustment. Given the Board's specialized knowledge in zoning matters [14]

---

11. *See* 83 Am.Jur.2d *Zoning & Planning* § 1 (1992) (stating that zoning ordinances have been enacted for the purpose of promoting the health, safety, morals, or general welfare of the community); *see also Nectow v. City of Cambridge,* 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928) (holding that a zoning restriction "cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare").

12. Section 17–27–102 of the Utah Code states that "in order to provide for the health, safety, and welfare, ... counties may enact all ordinances ... they consider necessary for the use and development of land within the county."

13. "Special exceptions provide an additional measure of flexibility where local zoning officials can acknowledge certain uses that may arise in a particular zone, and specifically allow for those uses in the ordinance by stipulating that such uses are subject to further administrative scrutiny." B.Y.U.J.Legal Stud., *Summary of Utah Law: Land Use, Zoning and Eminent Domain* § 11.32 (1979).

14. *See Xanthos v. Board of Adjustment,* 685 P.2d 1032, 1034 (Utah 1984).

and "the importance of professional expertise and community-wide perspective in zoning matters," [15] such a grant of discretion makes good sense. We recognize that the Board is in a much better position than we are to achieve the desired goal of proper zoning as determined by the county commission. *See Town of Alta,* 836 P.2d at 807 (Bench, J., dissenting); *see also Naylor v. Salt Lake City Corp.,* 16 Utah 2d 192, 398 P.2d 27, 29 (1965) (recognizing that the local governing body "is endowed with considerable latitude in determining the proper uses of property within its confines").

Nevertheless, this broad-based standard does not permit unfettered discretion on the part of the Board.

> While it is true that a zoning ordinance must set some ascertainable boundaries on the exercise of discretion by a zoning authority, such boundaries are not required to be unduly rigid or detailed. A generalized exposition of overall standards or policy goals suffices to direct the inquiry and deliberation of the zoning authority, and to permit appellate review of its decision.

*Thurston v. Cache County,* 626 P.2d 440, 443–44 (Utah 1981) (concluding that requirement that "the proposed use will not be detrimental to the health, safety, or general welfare" of persons or property in the area, while generalized, adequately channels discretionary activities of zoning authority). Any significantly stricter reading of the zoning standard would render its application unreasonably confused or inoperable. *See Murphy,* 886 P.2d at 80 (indicating that "statutory words are read literally, unless such a reading is unreasonably confused or inoperable" (quoting *Savage Indus., Inc. v. Utah State Tax Comm'n,* 811 P.2d 664, 670 (Utah 1991))). Few uses could, for example, demonstrably further or advance the public health, the public safety, *and* the public welfare.

In fact, when we view the zoning ordinance as a whole, it becomes clear that the county commission could not have intended too strict an interpretation of the requirement that a proposed special exception must promote the public health, safety and welfare. Section 3–34–C of the Utah County Zoning Ordinance specifically provides that "[t]he Board of Adjustment, as a special exception granted under the terms of Section 7–21 of this ordinance, may authorize an airport, flying field, or helicopter pad" in certain zones.[16]

Mr. Patterson claims that by approving an airstrip within two miles of an existing airport, with little information concerning the activity of the existing airport, the Board has created a hazard which jeopardizes the lives of people who use aircraft facilities in Cedar Valley. Mr. Patterson and the district court relied on this fact, as well as evidence presented to the Board that aircraft approach of the proposed airstrip from the east would be impossible because of the proposed airstrip's location near Lake Mountain, to conclude that the approval of the airstrip creates an inherently unsafe situation.

We disagree. The Board's record contains substantial evidence that the Board thoughtfully considered these and other safety issues in reaching its decision. At the hearing, the Board received testimony from the Utah County Planner that he "found that the other airport was far enough away ... so [he did] not see a conflict between the two." The Board did consider the activities of the Cedar Valley Airport, including the fact that it is a private commercial airport that sees significant use on the weekends.

More importantly the Board considered the impact of the proposed airstrip, receiving testimony of its minimal use. The Planner testified that "the degree of flying in both these airports would be very small, *and this one would be very small indeed compared to*

---

15. *Wilson v. Manning,* 657 P.2d 251, 252 (Utah 1982).

16. It may be difficult to see how a "flying field" could literally promote public health, safety, *and* welfare; yet, the county commission has authorized the Board to grant special exceptions for such a use.

Even more inconsistent with a strict interpretation of § 7–21–C(1) is § 3–35–B, which indicates that the Board, "as a special exception granted under the terms of Section 7–21 or this ordinance, may authorize an *explosives manufacturing, storage, or testing facility,*" provided certain other provisions are met. (Emphasis added).

the [Cedar Valley Airport.]" When questioned as to how often flights will land at or depart from the proposed airstrip, Mr. Buttars testified that "on a good week, once a week, but probably more like a couple of times a month." Because the two airports would be so close, the Board was in fact concerned that there would be too much competition for air space. Nevertheless, because the flights from the two airports would not be "one after the other," at least one Board member concluded that "that concern was relieved."

Furthermore, in response to whether there would be any coordination between the two airstrips, Mrs. Smith testified that they would communicate by radio and that with the channel open at all times, they would hear reports of take-offs and landings at the Cedar Valley Airport and that they would broadcast their own intended actions for the airport and other planes to hear. In addition, Mr. Smith testified that because of his familiarity with the Cedar Valley parachute jump sites, his flying through the valley would "probably be a little safer than the person who is unfamiliar with the area who is just flying through [like much of the] traffic everyday."

Addressing the close proximity of the mountain, Mr. Smith testified that they would not need to approach from the east and detailed for the Board how they would use the FAA approved and recommended traffic pattern at the proposed airstrip. When asked if there would be any situation making it necessary for turning toward the mountain, Mr. Smith responded that he could not think of such a reason "because it's kind of like having one hundred and eighty degrees to work in and not a narrow path or one quarter of a space, which is not unusual in your bush type or private airstrips."

Finally, the Board considered the proximity of the proposed airstrip to any existing subdivisions, the possibility of flights from the airstrip creating a distraction for local homeowners, the proximity of power lines to the airstrip, the possible necessity of FAA approval, the impact of winds and other natural conditions on flights out of the airstrip, and the possibility of converging flight patterns of local flights out of the airstrip with aircraft approaching the Salt Lake City International Airport.

Upon receiving all this evidence, one Board member concluded that "[i]n this particular case, [the proposed airstrip is] not endangering anyone. [Mr. Smith is] meeting all of the safety factors." The County Planner agreed, testifying that Mr. Smith had designed the airstrip "in such a way so that it's safe for him[,] and also it does not conflict with the rights of others, so it's good for both him and others."

Based upon these considerations, the Board approved the proposed airstrip, finding that the proposed use did promote the public health, safety, and welfare. The Board considered the location, design, and operation of the proposed use, any possible danger to local residents, as well as any possible infringement on competing property interests, and then balanced these considerations with the property owners' desire to use their property to their own enjoyment or economic advantage. Thus, we hold that substantial evidence in the record supports the Board's finding and overall decision.

## II. Alleged Violation of Section 3–34

■ Mr. Patterson also claims that construction and operation of the airstrip as approved expressly violates § 3–34 of the Utah County Zoning Ordinance, making the Board's decision illegal. Specifically, Mr. Patterson alleges that the proposed airstrip violates the regulations in § 3–34 regarding airport turning zones as well as the intent provision of the section.

Section 3–34–B(3) defines an "airport turning zone" as "[a] circular area surrounding an airport encompassing all of the land lying within a radius of two (2) miles distance from the landing strip of an airport, except that area covered by the airport, the transition zones, and the approach zones." The actual regulation states that "[i]n any airport turning zone, no building or structure shall be erected to a height greater than one hundred fifty (150) feet." Utah County Zoning Ordinance § 3–34–D(1)(c).

Mr. Patterson contends that proposed placement of the airstrip would violate the required turning radius because a large mountain lies to the east of the airstrip and the Cedar Valley Airport also lies within the two-mile zone. The district court agreed, stating that

> [t]he placement of the airstrip at the proposed location would not allow for an adequate turning radius[, and] [g]iven the close proximity of the mountain and the possibility of overlapping and converging flight patterns with aircraft utilizing the nearby Cedar Valley Airport, the Court must find that the Board violated section 3–34.

Nevertheless, the regulation does not require that no building or structure *exist* within the turning radius; instead, it merely requires that no such buildings or structures exceed 150 feet in height. Mr. Patterson does not contend that any structure at his airport rises to a greater height. Thus, the mere fact that his airport lies within the turning zone does not violate § 3–34–D(1)(c).[17]

Only if we construe the mountain as a "structure" that has been "erected" can we find any violation of the ordinance regulating airport turning zones. When faced with a question of statutory construction, we first examine the plain language of the statute." *Murphy v. Crosland*, 886 P.2d 74, 79 (Utah App.1994). When possible, we "must construe the statute according to its plain language." *State v. Paul*, 860 P.2d 992, 993 (Utah App.1993).

A "structure" has been defined as "[a]ny construction, or any production or piece of work *artificially built up* or composed of parts joined together in some definite man-

ner. That which is *built or constructed; an edifice or building of any kind.*" Black's Law Dictionary 1424 (6th ed. 1990) (emphasis added). The term "structure" plainly refers to some man-made work. In addition, "erect," as relating to a structure, means "to put up (as a building or machine) by the fitting together of materials or parts ...: [to] build," thus referring to an artificial rather than a natural process. Webster's Third New International Dictionary 770 (1986). Accordingly, a mountain, or any naturally rising terrain, does not violate the height restrictions of the airport turning zone as mandated in § 3–34.

Mr. Patterson alleges that the placement of the proposed airstrip also violates the general intent section of § 3–34, which states: "It is the intent of this section to avoid or lessen hazards resulting from the operation of aircraft, to avoid creation of new hazards, and to protect the lives of the people who use aircraft facilities." This statement represents the broad goal sought to be achieved by the county commission in enacting regulations governing height limits near airports and use restrictions. By satisfying the actual regulations enumerated in § 3–34, the proposed airstrip has met the legal requirements of that section. We will not find a violation of law simply because the Board's decision may seem inconsistent with the general intent statement found in § 3–34 when it is in compliance with the substantive provisions of that ordinance.[18]

## CONCLUSION

Since our review is limited to the Board's record, we do not consider any extraneous evidence presented by either party. We find

---

**17.** Mr. Patterson also claims the proposed airstrip violates the provisions of § 3–34 concerning airport approach zones and transition zones because his airport falls within these zones. However, like the turning zone regulation, these other provisions merely establish height restrictions. Thus, Mr. Patterson's claims fail for the same reason.

**18.** Mr. Patterson's brief also contains a reference to § 3–34–D(2), concerning use restrictions. Nevertheless, Mr. Patterson's brief contains no analysis of how the Board's decision approves a land use which "endanger[s] the landing or tak-

ing off of aircraft." Utah County Zoning Ordinance § 3–34–D(2). Therefore, we do not consider this allegation separately from Mr. Patterson's claim that the proximity of the two airstrips creates an "inherently unsafe situation." *See Financial Bancorp, Inc. v. Pingree & Dahle, Inc.*, 880 P.2d 14, 17 n. 3 (Utah App.1994) (declining to consider appellant's argument when appellant's brief presented little analysis of issue and cited no authority in support of position); *Baker v. Baker*, 866 P.2d 540, 544 (Utah App.1993) (refusing to address argument on appeal when analysis and argument are entirely inadequate).

the Board's decision to be supported by substantial evidence in the record. None of the Board's required findings have been shown to be arbitrary or capricious, and the Board's decision violates no provision of law. Accordingly, we reverse the district court's decision and let stand the Board's decision to approve the private airstrip.

GARFF and ORME, JJ., concur.